Edward E. MASON, Plaintiff,

v.

The Honorable L. Vern ROBINSON, District Court Judge of the Sixth Judicial District, Defendant.

No. 69143.

Supreme Court of Iowa.

Nov. 23, 1983.

Thomas J. Miller, Atty. Gen., Mark E. Schantz, Des Moines, and John R. Scott, Sp. Asst. Atty. Gen., for plaintiff.

H. Daniel Holm, Jr., and William C. Ball of Ball, Kirk & Holm, P.C., Waterloo, and Nick Critelli, Des Moines, for defendant.

F. Richard Lyford of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for amicus curiae Iowa Medical Soc.

SCHULTZ, Justice.

The issue presented in this action is whether a trial court has discretion to relieve an unwilling expert witness, who is a stranger to the litigation, from providing opinion testimony during a pretrial discovery deposition. Since we determine a litigant does not have an absolute right to compel an unwilling expert to give an opinion on facts outside the expert's personal knowledge, we hold that a trial court has discretion to either relieve or compel such testimony depending on the circumstances presented in a particular case.

This original certiorari action arises from a district court order compelling the plaintiff, Edward E. Mason, M.D., to respond to deposition questions involving his expertise in the field of gastric by-pass surgery. Although the district court is the nominal defendant in this proceeding, Mitchell, a medical malpractice plaintiff, is the interested party and has assumed defense of this action.

Dr. Mason's involvement in the present dispute had its origin in a medical malpractice action currently pending in Davis County, Iowa. Plaintiff in that action, Vicki Mitchell (executor of her husband's estate) alleged that the decedent, Ronald Mitchell, died as a result of negligence by three doctors and three nurses in their performance of gastric by-pass surgery. During the deposition of one of the defendant doctors, (Dr. Schiebe), Mitchell learned that the doctor had provided factual information about the surgery and its subsequent complications to the National Bariatric Surgery Registry at the University of Iowa Hospitals and Clinics. Dr. Mason is the director of the registry and a professor of surgery at the University of Iowa College of Medicine.

After learning of this exchange between the two doctors, Mitchell subpoenaed Dr. Mason to take his deposition in Johnson County. Although Mason appeared at the deposition, he refused to answer any questions concerning the information he had received from Dr. Schiebe. He felt the information was confidential since it was acquired in his capacity as director of the registry. Subsequently, Mitchell sought an order from the district court in Johnson County compelling Dr. Mason to answer not only questions regarding the factual information Dr. Mason had acquired, but also to give his expert opinion on the medical care received by the decedent in malpractice action. The district court, Judge Paul J. Kilburg, ruled the information given to Dr. Mason as head of the registry was not privileged pursuant to Iowa Code sections 135.40–.42 and directed Dr. Mason to answer deposition questions concerning this information. The court refused to compel any discovery of Dr. Mason involving his expertise since he had not been consulted by either party as an actual or prospective witness.

After this ruling, Mitchell amended her answers to interrogatories in her Davis County action to indicate that she intended to call Dr. Mason as an expert witness. She again subpoenaed Dr. Mason and also sent him a check for the statutory expert witness fee pursuant to Iowa Code section 622.-72. One day before the scheduled deposition Dr. Mason informed Mitchell that he was not willing to testify as an expert in the action. At the deposition, he answered all questions involving the factual information but repeatedly refused to answer any questions based on his expertise.

Mitchell again filed an application in Johnson County District Court. Specifically, she requested an order compelling Dr. Mason "to answer any and all of plaintiff's counsel's questions concerning his general knowledge of the area of gastric by-pass surgery and . . . regarding his general opinion as to the care received by Mr. Mitchell. . . ." Dr. Mason filed a resistance to the application supported by affidavit asserting that he was not a party to the case, he was not a treating physician in the case and he did not have an opinion concerning the medical treatment provided in the case, that he was not able to formulate an opinion concerning the standards of medical care applicable to this case without an extensive review of the medical literature and an examination of the medical records, that his testimony would jeopardize the research of the National Bariatric Surgery Registry, that his preparation and testimony in this case would interfere with his responsibilities at University Hospital, and that other experts were available to render opinions concerning the standard of care provided the decedent in this case. The matter was apparently submitted to the district court with the briefs and arguments of the parties but without any hearing or further record.

In response to Mitchell's application, the defendant district court, Judge L. Vern

Robinson, ordered Dr. Mason to answer deposition questions about the general standard of care in this type of surgery and any hypothetical questions about the particular standard of care received by decedent in the underlying medical malpractice action. The court also ordered the parties to negotiate the amount of compensation Dr. Mason would receive for his expert testimony. It did not require Dr. Mason to engage in any pre-testimonial preparation or investigation.

In its ruling on the motion to compel, the trial court principally relied on Iowa Rules of Civil Procedure 122(a) and 140(a). Taken literally, the language of these two rules permits deposition discovery from any person on any relevant matter that is not privileged. The court concluded expert testimony was relevant to the issues in the underlying malpractice action and expert witnesses do not enjoy any testimonial privilege in Iowa. Given the parameters of our discovery rules as well as the common law principle of the "public's right to every-man's evidence," the trial court apparently felt it lacked discretion to deny the motion to compel. Because we do not agree, the writ of certiorari is sustained.

■ Initially, we are confronted with the issue of whether a distinction should be made between compelling an unwilling expert to testify at trial as opposed to such compulsion in the pretrial discovery context. Normally the scope of discovery is not limited to evidence that would be admissible at trial. Iowa R.Civ.P. 122(a). The parties in their respective briefs have relied upon case authority involving expert compulsion in both pretrial and trial situations. Additionally, courts considering whether to compel expert testimony in discovery proceedings generally have not relied on any distinction between discovery and trial testimony in resolving the issue. *In re New York Municipal Securities Litigation,* 30 F.R.S.2d 842 (S.D.N.Y.1980) (magistrate's report subsequently adopted by district court); *Wright v. Jeep Corporation,* 547 F.Supp. 871 (E.D.Mich.1982); *Young v. Metropolitan Dade County,* 201

So.2d 594 (Fla.App.1967). Finally, while arguments could be made that these situations are factually and legally distinct, fairness dictates that an expert not be required to expend time and effort during the discovery process if he could not be compelled to testify at trial.

■ We conclude, in these limited circumstances, the right to compulsory discovery should be no broader than the right to compel the same expert to testify at trial. Accordingly, a trial court has the same authority to determine the need for and issue protective orders in the discovery context as it would at trial. Having disposed of this corollary issue, we now turn to consideration of the central issue involved in this case.

Mitchell contends a party has a right to opinion testimony as long as it does not require the expert to engage in any preparation. Thus, she reasons the district court order adequately protected Dr. Mason since it did not require him to do any extra work. Moreover, she claims the order conforms to our liberal construction of discovery rules and our strict construction of testimonial privileges. Finally, Mitchell insists the plaintiff is asking this court to engraft a testimonial privilege based on expert status onto our discovery rules.

The plaintiff characterizes the issue somewhat differently. Basically, he argues litigants do not have an absolute right to the expert of their choice. In particular, a party to a medical malpractice action does not have the right to compel previously unformulated opinion testimony from a physician who had no prior connection with the patient in question and who is unwilling to serve as an expert. He insists the creation of expert testimony for a litigant has always been a matter of contractual relations between the parties. Consequently, he urges that the voluntary nature of this relationship should not be overridden by a court except where a party has established that no other reasonable alternative is available. Finally, to the plaintiff, the issue is not one of testimonial privilege but whether he has a duty to testify in this

particular case. Since opinion testimony normally is available from more than one source, the question is whether Dr. Mason should become a witness at all, not whether he is privileged from disclosing certain relevant information. With these views in mind, we turn to the authorities relied on by the parties.

The cases concerning the compulsion of expert testimony vary greatly depending on the factual situations presented and the legal approach taken. See collection of cases contained in *Annot.,* 77 A.L.R.2d 1182 (1961); *Compelling Experts to Testify: A Proposal,* 44 U.Chi.L.Rev. 851, 854–55 n. 11 (1977) and cases cited therein. Additionally, secondary authorities disagree about the resolution of this issue. For instance, the *Comment* to 77 A.L.R.2d 1182 states that the weight of authority holds that, while a court cannot require an unwilling expert to engage in any out-of-court preparation or investigation, it does have the power to compel an expert to state whatever opinions he may have previously formed. On the other hand, it is indicated elsewhere that while an expert may be compelled to testify as to matters within his personal knowledge, he may not be compelled by a private litigant to testify as an expert, this being a matter of contract or bargain. 97 C.J.S. *Witnesses* § 16(b) (1957).

Plaintiff points out that four jurisdictions have adopted a broad rule that experts cannot be compelled to give testimony based solely on their expertise. *People ex rel. Kraushaar Bros. & Co., Inc. v. Thorpe,* 296 N.Y. 223, 225, 72 N.E.2d 165, 165–66 (Ct. of Appeals 1947) (an expert who previously had appraised the property in \question could be compelled to testify to his observations of property but not to his opinions); *Commonwealth v. Vitello,* 367 Mass. 224, 235, 327 N.E.2d 819, 827 (1975) (although opinion testimony about the value of voiceprint .evidence would be relevant, a party may not compel the involuntary testimony of an expert solely for his expertise and in the absence of any personal knowledge by the expert of the facts); *Braverman v. Braverman,* 21 N.J.Super. 367, 368, 91 A.2d 226, 227 (1952) (an expert can be required to

testify as to facts no matter how his knowledge of them was obtained but he cannot be compelled to give expert testimony unless he voluntarily contracts to do so); *Pennsylvania Co. for Insur. v. City of Philadelphia,* 262 Pa. 439, 442, 105 A. 630 (1918) (an unwilling expert cannot be compelled to testify at the request of a private litigant because that is a matter of bargaining and private agreement). *See also Agnew v. Parks,* 172 Cal.App.2d 756, 764, 343 P.2d 118, 123 (1959) (absent a pre-existing contractual duty to treat or examine a patient, a doctor has no duty to enter an agreement to render services as a medical expert).

Mitchell relies heavily on two federal cases to support her claim for compulsion. Both of these cases, however, are factually distinct from the situation presented for our decision.

In *Kaufman v. Edelstein,* 539 F.2d 811 (2d Cir.1976), the second circuit held that the trial court did not abuse its discretion in allowing the government in its antitrust action against IBM to compel testimony from two individuals with considerable expertise in the computer industry. Specifically, the government wanted these witnesses "to explain the nature of their duties as computer systems consultants and especially to recount advice they gave to various users and potential users of computer systems." *Id.* at 813. Significantly, the government was not asking for an expert evaluation of their evidence in the IBM case but instead stated that the witness's testimony would be confined to events which occurred between 1960–72. *Id.* As Judge Gurfein noted in his concurrence, these experts differed from the ordinary expert who has no personal relationship with the subject matter of the litigation. Indeed, they were intimately involved as observers of and participants in the growth and development of the electronic data processing market. *Id.* at 823. Finally, even the author of the majority opinion indicated that a substantial part of the testimony sought by the government could only be given by these particular experts. *Id.* at 821. Unlike the present case, most of the testimony

sought in the *Kaufman* case was factual rather than opinion. Moreover, these particular experts possessed unique information unavailable from any other source.

The other case relied on by Mitchell to support expert compulsion here is *Wright v. Jeep Corporation,* 547 F.Supp. 871 (E.D. Mich.1982). In *Wright* the defendant in a personal injury action, Jeep Corporation, sought discovery of a crash vehicle researcher who had published an adverse report on the safety of certain vehicles manufactured by the defendant. The information sought by Jeep was all research data and memoranda pertaining to a study of highway safety in which the researcher participated and out of which grew the adverse report. *Id.* at 873. Jeep was interested in learning the factual basis underlying the researcher's conclusion about its vehicle because it felt the study might be used against it at trial. *Id.* Although the researcher objected to discovery on the basis that, inter alia, he was an expert and could not be compelled to testify, the court held otherwise. In so ruling, the court noted the researcher was not being required to assist in explaining technical matters but rather was being required to disclose the underlying factual basis for his conclusions so the parties and the court could judge the validity of these conclusions. *Id.* at 874.

As was the case in *Kaufman,* the particular information sought from the *Wright* expert was not readily available from other sources. Moreover, while the factual observations sought in discovery may have involved some expertise and experience, neither the court nor the litigant in *Wright* were seeking an expert opinion per se from the researcher.

Thus, although both the *Wright* and *Kaufman* cases affirm the general principle that an unwilling expert is not immune from compulsory process merely because he is an expert, they do not support Mitchell's contention that a party has an unlimited right to compel the expert of his choice to provide opinion testimony. Quite the contrary, the decisions in these cases were based, in large part, on the peculiar need of the compelling party for the information sought and its unavailability from other sources.

Although we have not addressed the question of compulsory extraction of expert testimony from an unwilling witness not acquainted with the facts either in discovery or in trial situations, this court has repeatedly stated that our discovery rules should be liberally construed to effectuate disclosure of all relevant and material information to the parties. *Pollock v. Deere and Co.,* 282 N.W.2d 735, 738 (Iowa 1979); *Wheatley v. Heideman,* 251 Iowa 695, 702, 102 N.W.2d 343, 348 (1960); *Hot Spot Detector, Inc. v. Rolfes Electronics Corp.,* 251 Iowa 647, 651, 102 N.W.2d 354, 359 (1960). Additionally, we have been reluctant to create new privileges in this past, *In re Marriage of Gaumer,* 303 N.W.2d 136, 138 (Iowa 1981) or to expansively read existing ones. *State v. Farber,* 314 N.W.2d 365, 367 (Iowa 1982). We have recognized the principle that the public has a right to every man's evidence, *Winegard v. Oxberger,* 258 N.W.2d 847, 850 (Iowa 1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2234, 56 L.Ed.2d 402 (1978). We have also afforded our trial judges wide discretion over the course and conduct of a trial including such issues as the competency of a witness, *State v. Whitfield,* 315 N.W.2d 753, 755 (Iowa 1982); the number of witnesses on a certain point, *Ruby v. Chicago, Milwaukee & St. Paul Ry. Co.,* 150 Iowa 128, 133, 129 N.W. 817, 819 (1911); the attendance of witnesses at State expense, *State v. Mayhew,* 170 N.W.2d 608, 612 (Iowa 1969); and the witnesses' court attendance, *Hahn v. State,* 306 N.W.2d 764, 767 (Iowa 1981). Whether this discretion extends to excusing experts, who are strangers to the litigation, is the issue we must decide.

Plaintiff claims that the absolute right to testimony rule should be rejected because: (1) the expert's knowledge is a form of intellectual property with considerable economic value; (2) even with compensation it is unfair to take the expert's opinion involuntarily since he should be allowed freedom of choice regarding the best use of his time

and, further, has the right to select the recipient, if any, of his labor and service; and (3) public interest requires he devote his energy and talent to his surgical teaching and administrative duties at the University Hospital rather than in private litigation. We conclude that none of these reasons would necessarily preclude his testimony, although they may be legitimate considerations when a trial court is ruling on a motion for expert compulsion.

■ We do not choose to follow the approach of New York and other jurisdictions which totally excuse an unwilling expert without factual knowledge from testifying. The duty to testify or, alternatively, the "public's right to everyman's evidence" arises from the need of our judicial system to have access to all relevant information in ascertaining the truth. 8 J. Wigmore, *Evidence* § 2192 at 72–73 (McNaughten Rev. 1961). *See also United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1089, 1064 (1974). Although the duty to testify requires sacrifices from a citizen, the inconvenience to the witness may be overborne by the need of the court and litigant for the testimony.

■ On the other hand, neither do we believe that a litigant, in this instance, should have an unlimited power to compel expert testimony. In contrast to factual witnesses who possess knowledge which is unique and many times irreplacable, expert testimony is not based on any singular personal knowledge of the disputed events. Rather, it depends upon specialized training or other acquired knowledge which allows the expert to draw inferences and form conclusions. Since in most areas of expertise, many individuals possess the necessary qualifications to render expert opinions, this kind of testimony is usually duplicable. Consequently, unlike factual testimony, expert testimony is not unique and a litigant will not be usually deprived of critical evidence if he cannot have the expert of his choice.

The distinctive character of opinion testimony and the ability to obtain it from other sources has important implications for the common law principle of "the public's right to everyman's." Since necessity is the lodestar of this maxim, it may not be applicable to a particular expert, in the absence of some demonstrated need for his opinion.

Moreover, without judicial protection, numerous individuals would be subject to the demands of litigants. In a technical society, many individuals possess some expertise. Additionally, most claims would benefit from learned and expert illumination. Theoretically, parties, regardless of the size of their claim or its potential merit, could routinely issue subpoenas compelling expert discovery. Parties could engage in fishing expeditions, deposing several experts, in an effort to find one favorable to their cause. Although many of these concerns may be exaggerated, the potential for abuse if a party has an unlimited right to compel expert discovery is very real.

■ We prefer to take a middle ground between total excuse and unlimited compulsion of expert opinions from a stranger to the litigation. We deem that generally an expert witness, absent some other connection with litigation, is free to decide whether or not he wishes to provide opinion testimony for a party.

■ This is not to say compulsion is never proper. Rather, the distinction between previously formed opinions and those requiring preparation does not serve as a sufficient justification for the abrogation of an expert's right to freely contract for his services. Conversely, the principle of necessity does provide a sound basis for compulsion of an unwilling expert's testimony. Consequently, before the court compels an expert to testify solely on the basis of his expertise and in the absence of any other connection to the litigation, the compelling party should affirmatively demonstrate some compelling necessity for an expert's testimony that overcomes the expert's and the public's need for protection. Additionally, an adequate plan of compensation must be presented. Finally, an expert only can be compelled to give previously formed

opinions and can not be required to engage in any out-of-court preparation.

■ If, after balancing the relative rights of the expert and the needs of the litigants, necessity is established, then the fair and just administration of our judicial system would override any concerns about forcibly extracting a prior opinion from an expert. In cases of necessity, a duty would arise on the part of the expert to provide opinion testimony. Such a duty would run not to the compelling party but to society and its need for all relevant information in ascertaining the truth. 8 Wigmore § 2192 at 72–73. Conversely, in the absence of such showing, a particular expert has no duty to provide opinion testimony.

■ Thus, we conclude our trial courts have wide discretion to quash subpoenas or issue protective orders whenever a litigant's demand for a particular expert constitutes an unnecessary or unwarranted intrusion. Conversely, the trial court has the power to compel an unwilling expert to provide preformulated opinion testimony whenever a litigant establishes a compelling need for the testimony.

At this time, we do not choose to establish specific standards for the trial bench to utilize when confronted with this issue. We not only cannot foresee all of the problems that may arise, but we are also aware of the ingenuity of litigants and counsel to adapt and use guidelines to their advantage in a manner that would result in a rigid rather than a flexible approach to the resolution of this problem. Our trial courts are in a better position to balance the rights of the witness and any unfairness that may result from expert compulsion against the need of the court and litigant for the testimony. We deem it better to grant them discretion to consider a variety of factors and their appropriateness to or importance in deciding each individual case.

■ Here, the trial court determined it could not excuse the witness from testifying but could restrict the scope of the inquiry. Consequently, the court did not exercise discretion in deciding whether Dr. Mason should be required to give expert opinion testimony. We hold this was error.

■ We find it unnecessary to remand this matter for a ruling, however. Mitchell did not present any evidence by affidavit or otherwise supporting her motion for compulsion of Dr. Mason's expert opinion. Dr. Mason's affidavit that other physicians in the state are qualified to render expert opinion in the medical malpractice action is unrefuted. Since Mitchell did not affirmatively demonstrate a compelling necessity for this particular witness's expert testimony, the trial court erred in granting her application. Consequently, we remand for entry of an order denying Mitchell's application.

In the limited circumstances of this case, we find sufficient grounds for sustaining the writ of certiorari.

WRIT SUSTAINED.

All Justices concur except LARSON and McGIVERIN, JJ., who dissent.

LARSON, Justice (dissenting).

The effect of this case, it seems to me, is to superimpose on our existing procedural and evidence rules a virtual veto power, in the hands of "expert" witnesses, over the courts' well-established claim to "every man's evidence." This result does not proceed from a recognition of an established "expert witness" privilege, because there is none. Rather it appears to proceed on the premise that such witnesses owe no duty to testify at all, at least in the absence of a showing of necessity by the litigant seeking to use it as evidence.

The majority holds that an expert may be compelled to testify but only upon certain threshold showings. This hybrid procedure, which appears to be unique among all the states, rejects both the majority rule, which is that expert witnesses may be compelled to testify the same as any other witnesses, as well as the minority view, which is that expert testimony cannot be compelled at all. In striking this middle ground, the majority thus rejects the benefit of the majority rule, which is the advancement of the prin-

ciple of "every man's evidence" as well as the certainty of the minority rule. The rule adopted by the majority restricts the search for evidence and injects new uncertainties.

The majority would concede, I assume, that if inquiry of this witness were limited to observed facts, as opposed to those based upon education, training or experience, he could be compelled to testify without the necessity of the preliminary showing which it requires here. Yet there is no rational basis for applying different rules to witnesses furnishing "scientific" as opposed to "observed" facts. One is the product of learning and experience, the other of direct perception but, if the whole purpose of witness evidence is to assist the fact trier, what is the difference? As will be discussed later, the arguments raised by Dr. Mason as to why he should not be compelled to testify as an expert can be made as well by the nonexpert. This brings me to what I believe is the first major defect in the majority's analysis, the legal basis of the specialized treatment of expert witnesses.

## I. *The Legal Principles.*

It is universally recognized that the courts are entitled to "every man's evidence," and the majority opinion recognizes this. The only exceptions to the general rule arise under rules of exclusion or privilege. In contrast to other witnesses who may be compelled to testify without any foundation showing of necessity for it and unavailability of other witnesses, the expert witness such as Dr. Mason cannot be compelled to come forward until that threshold showing is made, according to the majority. This disparate treatment must surely be considered a privilege, at least a qualified one.

The duty to give testimony is not owed to the litigants or the lawyers, or even the courts, but to the community, or to society as a whole. 8 J. Wigmore, *Evidence* § 2192, at 73 (McNaughton rev. 1961).

The whole life of the community, the regularity and continuity of its relations, depends upon the coming of the witness. Whether the achievements of the past shall be preserved, the energy of the present kept alive and the ambitions of the future be realized depends upon whether the daily business of regulating rights and redressing wrongs shall continue without a moment's abatement, or shall suffer a fatal cessation. The business of the particular cause is petty and personal, but the results that hang upon it are universal. All society, potentially, is involved in each individual case. The vital process of justice must continue unceasingly. A single cessation typifies the prostration of society. A series would involve its dissolution. The pettiness and personality of the individual trial disappear when we reflect that our duty to bear testimony runs not to the parties in that present cause, but to the community at large and forever.

*Id.*

Because the interest in obtaining testimony of witnesses is, in essence, that of the community, it seems reasonable that grounds for a witness privilege or exclusion must be of comparable stature, that is a *societal* interest rather than the interest of a person, or even a group of persons.

That the principle of witness privilege is not based upon concern for the individual is illustrated by the fact we have a statute, Iowa Code section 622.13, which provides that a witness may not be excused from testifying on the ground it will result in personal liability. We held in *Gibb v. Hansen,* 286 N.W.2d 180, 187–88 (Iowa 1979), that fear for personal safety of a witness gives rise to no privilege, and the Supreme Court, in *Piemonte v. United States,* 367 U.S. 556, 559 (n. 2), 81 S.Ct. 1720, 1722 (n. 2), 6 L.Ed.2d 1028, 1031 (1961) held that even a fear for the life of the witness and his family was not sufficient to abrogate his duty to testify.

The societal, as opposed to personal, interest in witness privileges is apparent from examination of their rationale. The qualified reporter privilege, recognized by the Supreme Court in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and by our court in *Lamberto v.*

*Bown,* 326 N.W.2d 305 (Iowa 1982) is based upon the first amendment principles which, it is said, "are not for the benefit of the press so much as for the benefit of all of us." *Time, Inc. v. Hill,* 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456, 468 (1967).

In *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (1980), the Supreme Court discussed the rationale of the priest-penitent, physician-patient and attorney-client privileges, which is a societal interest in maintaining confidence and trust in their communication. The Supreme Court in *Trammel* noted the public's "right to every man's evidence" and that, because testimonial exclusionary rules and privileges contravene that principle, they

> must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a *public* good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."

*Id.* (quoting Frankfurter dissent in *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669, 1695 (1960) (emphasis added.)) *Accord, United States v. Nixon,* 418 U.S. 683, 709–10 (n. 18), 94 S.Ct. 3090, 3108 (n. 18), 41 L.Ed.2d 1039, 1065 (1974).

Consistent with this view, one authority has observed that "[t]he investigation of truth and the enforcement of testimonial duty demand restriction, not the expansion of these [testimonial] privileges. They should be recognized only within the narrowest limits required by principle." 8 J. Wigmore § 2192, at 73 (McNaughton rev. 1961).

With these principles in mind, consider Dr. Mason's objections in this case: (1) He was not the treating physician; (2) he was not a party to the suit; (3) he had no opinion concerning the medical treatment provided; (4) he was not able to form an opinion without preparation; (5) his testimony would "jeopardize" the research of the National Bariatric Surgery Registry; (6) his testimony would interfere with his duties at University Hospital; and (7) other experts were available, who presumably would not object to testifying.

Most of these objections would be as applicable to the nonexpert as well as the expert witness. Moreover, none of these objections rises to the level of a significant societal interest.

As to Dr. Mason's objection based upon the time it would take, it would have taken less of his time if he had simply answered the questions. He was not required to spend time outside of the depositions preparing to testify; Judge Robinson's order specifically provided that. Anyway, the time of the litigants, lawyers and courts should count for something in this matter. Here the doctor's refusal to answer these questions began a series of legal proceedings which have now extended over a period of almost two years and have consumed considerable time on the part of all the principals.

I believe the prevailing rule is that expert witnesses may be compelled to testify the same as any other. 4 J. Moore, *Federal Practice* ¶ 26.66[1], at 26–469 (1983) (states this to be prevailing rule; expert, however, cannot be compelled to prepare for testimony); *Carter-Wallace, Inc. v. Otte,* 474 F.2d 529, 536 (2d Cir.1972), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973) (the "weight of authority [is that], although it is not the usual practice, a court does have the power to subpoena an expert witness and, though it cannot require him to . . . prepare himself for trial, it can require him to state whatever opinions he may have previously formed. (citations omitted)"); *Dixon v. People,* 168 Ill. 179, 191–92, 48 N.E. 108, 111 (1897) ("[W]hen [an expert] is required to answer a hypothetical question, which involves a special knowledge peculiar to his calling, he is merely required to do what every good citizen is required to do in behalf of public peace and public order and in promotion of the public good"). The court in *Dixon* said the expert in possession of "scientific" facts should be treated as any other fact witness. *See also Kaufman v. Edelstein,* 539 F.2d 811, 820 (2d Cir.1976)

("no constitutional or statutory privilege against the compulsion of expert testimony, and we perceive no sufficient basis in principle or precedent for holding that the common law recognizes any general privilege to withhold ... expert knowledge"); *Wright v. Jeep Corp.,* 547 F.Supp. 871, 873 (E.D. Mich.1982) (held expert could be compelled to testify, weighing the duty to testify against certain societal interests).

At common law there was no privilege for expert witnesses, although there are arguments that might support at least a qualified privilege. A few federal courts invoked privilege as a ground for denying discovery of expert information, but this view was repudiated by a majority of the decisions and by the Advisory Committee on Civil Rules. Courts have declined to create a privilege for expert witnesses under Rule 501. There are, however, some restrictions on discovery from expert witnesses under the Civil Rules; it is to be hoped that these restrictions will not be converted into a privilege.

(Footnotes omitted). 23 C. Wright and K. Graham, *Federal Practice and Procedure* § 5431, at 825–26 (1980).

II. *The Practical Considerations.*

Completely aside from the legal considerations, I believe the procedure adopted in this case will create uncertainty and confusion in the area of expert testimony. The majority expressly rejects the adoption of any specific standards for application of its expert-witness rule; the only thing which is certain is that the established rules and procedures applicable to witnesses in general will now be inapplicable, and a new procedure without any standards or rules will be substituted.

At the outset, it will be difficult in many instances to determine whether this appeal rule is applicable. Under Iowa Rule of Evidence 702, defining "expert" witnesses, almost any witness could be included, at least as to some of his testimony. So we could have two rules applicable to the same witness. This is exactly what happened in Dr. Mason's case; the court concluded that, because some of his testimony was "expert"

and some "nonexpert," he could be compelled to answer some questions but not others. What is an expert is an inexact determination at best. Looking to the nature of the evidence to determine whether the witness is an expert must necessarily entail a consideration of whether the evidence is "opinion" or "fact," labels which themselves are subject to considerable uncertainty. Dr. Mason's case again furnishes an example: When he was asked who, among other doctors, was an expert in this area, he refused to respond, saying that evaluation of the doctor was itself expert testimony. Some, however, might rationally argue this was "fact" testimony. The point is there could be a valid argument as to what rule is applicable, because of disagreement as to the type of witness or evidence involved.

Reliance on whether the proposed evidence is "fact" or "opinion" is not realistic, as these terms themselves escape workable definition. As Wigmore has observed,

there is no virtue in any test based on the mere verbal or logical distinction between "opinion" and "fact." There is perhaps, in all the law of Evidence, no instance in which the use of a mere catch-word has caused so much of error of principle and vice of policy;—error of principle, because the distinction between "opinion" and "fact" has consistantly [sic] and wrongly been treated as an aim in itself and a self-justifying dogma; vice of policy, because if this specious catch-word had not been so handily provided for ignorant objectors, the principle involved would not have received at the hands of the Bar and the Bench the extensive and vicious development which it has had in this country.

It is necessary now to notice why, so far as the principle or the reason of the thing is concerned, the law takes no more special account of a logical difference between "opinion"-testimony and "fact"-testimony than between testimony by a short witness and testimony by a tall witness.

Wigmore, *supra* § 1919, at 14. And, another authority has said that

> [t]his classic formula [for distinguishing fact and opinion], based as it is on the assumption that "fact" and "opinion" stand in contrast and hence are readily distinguishable, has proven the clumsiest of all the tools furnished the judge for regulating the examination of witnesses.

C. McCormick, *Evidence* § 11, at 23 (1972).

Further confusion will result because the litigant seeking to compel expert testimony must show that other "qualified" witnesses are "unavailable." Yet, who is qualified and what makes a witness available? There are no guidelines provided by this new rule. Is a willing expert "available" if he lives in Denver? Or Los Angeles? And, is a doctor with half Dr. Mason's experience "qualified"?

Objections based on distance required to be traveled have no more bearing as to expert than any other witnesses. Under Iowa Code section 622.66, no witness may be compelled to attend at a distance over 100 miles.

In summary, I think an expert witness should be treated like any other. I do not think he can be compelled to prepare for his testimony because this smacks of involuntary servitude. Other objections, such as raised by Dr. Mason, should be considered like those of any other witness and should be considered by the trial court in an application for a protective order.

The prophylactic rule adopted by the majority, simply excluding the evidence in the absence of the threshold showing, is not only contrary to the prevailing view; it will cast the district court adrift without specific rules or guidelines and will therefore be virtually unworkable.

Judge Joiner, in the *Wright* case summarized my feelings about this issue. Recognizing that some experts would likely be busy in court, he observed that

> [t]he solution is not to cover-up the information or its data base because disclosure is too burdensome but to use the tools available to lessen the burden and to permit the information to become available.

*Wright v. Jeep Corp.,* 547 F.Supp. at 877. I would annul the writ.

McGIVERIN, J., joins this dissent.