In re the MARRIAGE OF Susan R. REBOUCHE and Richard R. Rebouche.

Upon the Petition of

Susan R. Rebouche, Petitioner–Appellee,

And Concerning

Richard R. Rebouche, Respondent–Appellant.

No. 97–1144.

Court of Appeals of Iowa.

Sept. 30, 1998.

Eric Borseth of Borseth & Genest, Des Moines, for appellant.

Bernard L. Spaeth, Jr. and Angela A. Shutts of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

VOGEL, J.

Richard Rebouche appeals the custody and economic provisions of the decree dissolving the parties' marriage. We affirm.

***Background facts.*** Richard and Susan met in college and married in August of 1984. Two children were born to the marriage, Richard in 1990 and Robert in 1991. Susan also has a daughter from a previous marriage who is in the primary care of her father. At the time of trial, both Richard, then thirty-one, and Susan, then thirty-eight, were employed by the Principal Financial Group in Des Moines, with Susan earning an annual salary of approximately $64,000 and Richard $53,000.

After trial, the district court granted the parties joint custody of the children, with Susan designated as the primary care parent. Richard was ordered to pay $853 a month in child support. Except for awarding each party their own pensions and assigning Susan the mortgages on the home, the court made an essentially equal division of property. Richard appeals.

***Scope of review.*** In this equity action, our review is de novo. Iowa R.App.P. 4. We have a duty to examine the entire record and adjudicate anew rights on the issues properly presented. *In re Marriage of Steenhoek,* 305 N.W.2d 448, 453 (Iowa 1981). We give weight to the fact findings of the trial court, especially when considering the credibility of the witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7).

***I. Primary physical care.*** In assessing an issue of child custody, the controlling consideration is the interest of the children. *In re Purscell,* 544 N.W.2d 466, 468 (Iowa App.1995). The court determines placement according to which parent can minister more effectively to the children's long range best interests. *In re Marriage of Buttrey,* 538 N.W.2d 322, 324 (Iowa App. 1995) (citing *In re Marriage of Vrban,* 359 N.W.2d 420, 424 (Iowa 1984)). The court's objective is to place the children in the environment most likely to bring them to a healthy physical, mental, and social maturity. *In re Marriage of Kunkel,* 555 N.W.2d 250,

253 (Iowa App.1996). The critical issue in determining the best interests of the child is which parent will do better in raising the child; gender is irrelevant, and neither parent should have a greater burden than the other. *In re Marriage of Courtade,* 560 N.W.2d 36, 38 (Iowa App.1996).

Richard contends he should have been awarded primary care of the children, claiming the trial court demonstrated bias against him and abused its discretion. In particular, Richard complains that the court limited the number of witnesses he could present and did not allow certain of his exhibits into evidence. Richard further asserts that the trial court improperly discounted the recommendation of Dr. Craig Rypma, who was appointed by the court to do a custody evaluation. Finally, Richard contends that the court did not given sufficient weight to Susan's history of affairs and contends that Susan used a domestic abuse petition for an improper purpose.

 *Limiting number of witnesses and excluding exhibits.* Richard first claims the trial court abused its discretion in excluding certain witnesses. However, the record reveals that the parties agreed upon a specified list of witnesses at the outset of trial, and we found no objection by Richard in the record.[1] We will not consider objections to procedure for the first time on appeal. *See Conner v. State,* 362 N.W.2d 449, 457 (Iowa 1985); *In re N.W.E.,* 564 N.W.2d 451, 455 (Iowa App.1997). Furthermore, we afford trial judges wide discretion over the course and conduct of a trial, including such

issues as the number of witnesses on a certain point. *See Mason v. Robinson,* 340 N.W.2d 236, 241 (Iowa 1983); *Ruby v. Chicago, Milwaukee & St. Paul Ry. Co.,* 150 Iowa 128, 133, 129 N.W. 817, 819 (1911) (trial court has power to limit the number of witnesses on a given point, but the order should be made either in advance of trial or before testimony is introduced on that point); *see also* Iowa R.Evid. 403; *Carter v. MacMillan Oil Co., Inc.,* 355 N.W.2d 52, 55 (Iowa 1984) (trial court has discretion to exclude relevant evidence when its probative value is substantially outweighed by confusion of issues or considerations of waste of time); *In re Marriage of Ihle,* 577 N.W.2d 64, 67 (Iowa App. 1998).

 Richard also claims that the court demonstrated bias by failing to admit several of his proposed exhibits. The exhibits which the court did not allow into evidence were transcripts of conversations between Richard and Susan, between Susan and third parties, and between Richard and third parties. Richard admitted that the tapes were made without Susan's knowledge; that he had transcribed the tapes himself and added his own editorial comments; that the transcripts were incomplete; and that he had misplaced some of the original tapes. After reviewing all of Richard's complaints, we find Richard failed to prove bias by the court's refusal to allow into evidence these and other exhibits proposed by Richard.

Richard also asserts that the district court "used its position of authority to intimidate Richard into limiting his answers," and

---

1. A record was made at the commencement of trial indicating that the parties had, with the guidance of the court, pared down their witness lists. Susan's counsel recited the lists to the court for confirmation; Richard's counsel made no objection. At the conclusion of trial, the court stated on the record:

 After discussion with counsel, the Court has decided that with respect to the Court's rulings at the onset of this matter, that the Court was going to exercise its inherent discretion in limiting the number of witnesses and at the conclusion of the admission of testimony, the Court will decide as to whether or not sufficient number of witnesses had been presented for the Court to decide the issues in this matter. Save Dr. Faust's testimony, the Court does find that there has been sufficient testimo-

 ny on the issues that were certified and to be tried to this Court and therefore the Court at this time, except for testimony of Dr. Faust, considers the record closed.

 In conjunction with that, the Court has given the parties an opportunity to present offers of proof with respect to any additional witnesses they wish to present in this matter. And after discussion with counsel, it is the Court's understanding that the offers of proof will be submitted in writing by the respective parties in conjunction with the affidavit for attorney fees.

 With submission of offers of proof, the affidavits, and the deposition of Dr. Faust, it is the Court's understanding that the record will then be closed and the matter finally submitted.

"scold[ed] him while on the stand concerning his method of answering questions." After reviewing the court's statements, we find absolutely no merit in these allegations.

***Objectivity of the court appointed evaluator.*** Richard next contends the trial court failed to give adequate consideration to Dr. Rypma's testimony and recommendation that he be granted primary physical care.

 Rypma was ordered by the district court to serve as a custody evaluator. He was specifically directed to: (1) interview the parties; (2) interview the children; (3) observe the parties with the children; (4) interview third parties; and (5) administer psychological tests. Rypma interviewed both parties, observed each parent one time interacting with the children, administered tests to Richard and Susan, and interviewed one third party prior to drafting his report. He did not, however, interview the children. In his report, Dr. Rypma concluded that the children's best interests would be served by primary physical care being placed with Richard. In support of this conclusion, Dr. Rypma stated:

> This recommendation is based primarily on results of this evaluation, particularly Richard's superior performance while interacting with his children as observed in the observation phase of this evaluation, on his superior empathy demonstrated during the clinical interview phase of this evaluation, and on this evaluator's concern regarding the children's well-being given the mother's behavior around the domestic abuse charge and her judgment regarding the impact of her relationships on the adjustment of these minor children.

The trial court rejected Dr. Rypma's recommendation, finding that the custody evaluation was not performed in an objective format. We agree. Dr. Rypma admitted that Richard was the primary, if not sole, source of information from which he based his conclusions about Susan. Dr. Rypma received four full volumes of information from Richard.[2] However, Dr. Rypma testified that he

did not inform Susan that he had received these materials so that Susan could provide comparable information, nor did he ask Susan to respond to the materials. Furthermore, he did not contact any third parties to corroborate the allegations contained within the materials prior to filing his report. In addition, although Richard had elevated scores on the paranoia and psychopathic deviant scales of psychological tests that Dr. Rypma administered to the parties, this information was not included in his discussion of the test results in his custody evaluation report.

 The record supports that although Dr. Rypma was appointed to conduct an independent evaluation, he essentially acted as an advocate for Richard. Dr. Rypma admitted that he had met twice with Richard's counsel before trial to go over his testimony and answers to possible cross-examination questions. He did not meet with Susan's counsel. Dr. Rypma also resisted making Richard's test results available to Susan's counsel, and delayed providing his custody report, test evaluations and the play interaction videos to Susan's counsel until shortly before trial. This is not the standard of conduct the court would expect of a independent evaluator. To effectively aid the court in making difficult custody determinations, the court should be able to have confidence in the neutrality of the evidence and testimony provided by the very experts the court appoints to carry out this critical function. Absent that neutrality, the expert testimony fails in its function, and the court has lost the assistance it anticipated. Moreover, the parties have wasted time and often scarce resources in the process. We consider the lack of neutrality of the independent expert in assigning weight to his opinion on the issue of custody. *See Nicolou v. Clements,* 516 N.W.2d 905, 909 (Iowa App.1994) (testimony of experts must be accorded weight, but their final conclusions are not binding on the trier of fact nor on the appellate courts).

---

**2.** Dr. Rypma testified that he was aware he had been provided with taped conversations that Richard had made without Susan's knowledge and items that had been taken from Susan's desk

without her knowledge. Dr. Rypma acknowledged that Richard's behavior in securing these items troubled him somewhat, but did not mention it in his custody evaluation:

*Domestic abuse incident.* Richard next contends that Susan used a filing of a domestic abuse petition for an improper purpose, and this should be considered against her position on the issue of primary physical care.

At trial, a record was made to indicate that the parties had agreed they would not present evidence on the domestic assault incident that occurred in July of 1996. However, the parties asked that the court take judicial notice of the fact that Richard was found guilty of domestic assault under Iowa Code Chapter 236, but was acquitted in a criminal assault proceeding. Because there was a finding of domestic abuse under chapter 236, we find no merit in Richard's assertion that Susan sought the protection of the court for an improper purpose. We do, however, believe that a discussion of the domestic abuse ruling is relevant to the issue of primary care.

During the domestic abuse incident, Richard secretly had a tape recorder running. He then offered the tape into evidence at the Chapter 236 hearing to claim that he was merely defending himself against Susan. After listening to the tape, the district court stated:

> On the tape I heard Richard speaking in a tone completely different from the tone he spoke with in this courtroom. I heard him sound patronizing on that tape. I heard him sound almost sanctimonious on that tape ... he was the only one who knew the information was being recorded. He was surreptitiously recording what was going on at the time between the parties, and he comes in to this court with an explanation that his conduct was defensive in nature, that he was resisting his wife's attempt to enter a room, .... My question is who did create the situation? ... it seems to me that he created the situation. He created the known conflict that was going to occur between these parties.... It is clear from my seeing the evidence that there was and his admission that he did physically take a hold of her arms, and I see bruises on the pictures that have been introduced, and I think those bruises

directly resulted from the force that the Defendant used against the Plaintiff.

This ruling not only made the finding of domestic abuse but also found that Richard had engaged in surreptitious activity. Other examples of similar behavior by Richard, supported in the dissolution record, include his taping of Susan's phone conversations; going through her desk at work and retrieving information from her office computer, including communications between Susan and her attorneys; obtaining Susan's medical and pharmacy records and supplying them to Dr. Rypma along with items from her medicine cabinet; opening and manipulating mail that Susan was sending; using a baby monitor to eavesdrop on Susan's conversations with the children; and unnecessarily distressing the children by involving them in the marital conflict. We find these behaviors reflect poorly on Richard's character in his request for primary physical care of the children.

*Primary care factors.* We identify numerous factors to help determine which parent should serve as the primary caretaker of the children in a divorce. *In re Marriage of Daniels,* 568 N.W.2d 51, 54 (Iowa App.1997) (citation omitted); *see* Iowa Code § 598.41 (1997). Some factors are given greater weight than others, and the weight ultimately assigned to each factor depends on the particular facts of each case. *See Daniels,* 568 N.W.2d at 54; *In re Marriage of Will,* 489 N.W.2d 394, 397 (Iowa 1992). We have previously recognized domestic abuse as a factor in determining the custodial parent. *Daniels,* 568 N.W.2d at 54; *see also In re Marriage of Brainard,* 523 N.W.2d 611, 614–15 (Iowa App.1994). Moral misconduct is also a factor to be accorded weight in a child custody determination; however, it has been weighed most heavily only in those cases where the misconduct occurred in the presence of the children. *See In re Marriage of Grandinetti,* 342 N.W.2d 876, 879 (Iowa App.1983).

Unfortunately, the trial court made few specific findings on the issue of primary physical care other than to discount the weight given Dr. Rypma's opinion. However, two district court judges, the first on the

petition for relief from domestic abuse, the second for the dissolution trial, heard a total of five days of testimony with numerous witnesses for Susan and Richard. Both judges came to the same conclusion—that Susan should have primary physical care of the children. Despite the lack of specific findings by the trial court following the dissolution trial, there were lengthy findings made by the district court after hearing the domestic violence issue. There is also ample evidence in the record supporting the dissolution court's conclusions, particularly in regard to the non-objectivity of Dr. Rypma's custody evaluation.

While it is apparent that Richard has made great efforts to maintain and strengthen his relationship with the children since the parties' separation, the record supports that Susan was historically the primary care giver of the children. Although she worked full time, Susan had a flexible schedule that allowed her to break away from the office to attend to the children as needed. Notwithstanding Susan's role, Richard contends that emphasis should be placed on Susan's affairs, which occurred after the breakdown of the marriage. Susan acknowledged these relationships; however, the record does not suggest that she brushed aside her substantial parenting responsibilities to further her own social life. The record does not reflect that Susan's relationships had an adverse effect on the children. At the end of their marriage, Susan sought out relationships while Richard occupied himself with a variety of ways to spy on Susan and manipulate the children in an escalating custody fight. Neither party behaved perfectly; both struggled in their own ways to cope with the breakdown of the marriage and the attendant disruption of the family.

The district court found in the domestic abuse hearing, as did the trial court in the dissolution trial, that primary physical care of the children should be granted to Susan. On our de novo review, we find the record supports this finding. We therefore affirm

the trial court's decision to grant primary physical care of the children to Susan.

■ **II. Retirement Accounts.** Richard argues that the value of the parties' retirement accounts should be divided equally. The trial court awarded Susan her account valued at $27,365, and Richard his account valued at $19,000. Susan argues there need not be an equal division, because she is assuming more debt than Richard and because she is older and will have less chance to contribute to her retirement.

■ Partners to a marriage are entitled to a just and equitable share of the property accumulated through their joint efforts. *In re Marriage of Hass,* 538 N.W.2d 889, 892 (Iowa App.1995). Retirement plans should be considered in framing the financial clauses of a dissolution decree. *See In re Marriage of Voss,* 396 N.W.2d 801, 803 (Iowa App.1986). Richard complains that Susan effectively received $8,365 (the difference between their retirement account values) more in joint marital assets than he did. However, Susan was also assigned the $70,000 debt on the home, and Richard was assigned none.[3] Under these circumstances, we do not believe that equity requires that Richard share in Susan's retirement account.

■ **III. Expert costs.** Richard challenges the trial court's decision to charge him with more than one-half of Dr. Rypma's charges. The trial court has considerable discretion in fixing fees and costs. *See In re Marriage of Muelhaupt,* 439 N.W.2d 656, 662–63 (Iowa 1989). We find no abuse of discretion and affirm the trial court on this issue.

Having considered all issues properly before us on appeal, we affirm the district court's decree.

**AFFIRMED.**

All judges concur except SACKETT, P.J., and HUITINK, J., who concur in part and dissent in part.

---

**3.** Although not clearly expressed in the decree, it appears from the record that this debt was not offset by an award of assets to Susan.

SACKETT, J. (concurring in part; dissenting in part).

I concur in part and dissent in part. Richard has challenged the custody and economic provisions of his dissolution decree.

The focal issue is whether the trial court awarded physical care of the children to the parent who will do the better job of handling the primary responsibility of the children's care. *See In re Marriage of Ullerich*, 367 N.W.2d 297, 299 (Iowa App.1985). Unfortunately, despite conducting a four-day trial, the district court gave us scant direction for the reasons he employed to reach the decision he did on the custodial issue. His one factual finding was:

> The court in making this finding has considered the recommendations of the court appointed custody evaluator. It is the court's opinion that the custody evaluation was not performed in an objective format so as to cause this court to rely on the evaluator's conclusions and opinions.

The parties originally recognized custody would be an issue and agreed to have the court appoint as a custody evaluator Craig B. Rypma, who was specifically directed to: (1) interview the parties; (2) interview the children; (3) observe the parties with the children; (4) interview third parties; and (5) administer psychological tests. Rypma, a licensed clinical psychologist who holds an M.B.A. and a Ph.D., made a substantial investigation. He interviewed Richard for four hours and Susan for three. He held diagnostic play evaluations of three hours each with Richard and Susan. He did the same psychological assessment on each. He noted strengths and weaknesses of each parent and ultimately concluded:

> Both of these parents are loving and caring towards their children. The observations and recommendations contained in this study are not meant to reflect opinions about their abilities and endeavors in other areas of life. Nevertheless, based on the results of this evaluation, it is the opinion of this office that the minor children's best interests are served by primary physical care being placed with Richard Rebouche. This recommendation is based primarily on results of this evaluation, particularly

Richard's superior performance while interacting with his children as observed in the observation phase of this evaluation, on his superior empathy demonstrated during the clinical interview phase of this evaluation, and on this evaluator's concern regarding the children's well-being given the mother's behavior around the domestic abuse charge and her judgment regarding the impact of her relationships on the adjustment of these minor children.

I found Rypma gained considerable insight through his evaluation.

The majority has seen fit to criticize Rypma for his lack of neutrality. Rypma came to the conclusion Richard was the better custodial parent. Having come to that conclusion, I am of the opinion it was Rypma's responsibility to advance that opinion, giving the reasons he reached the conclusion in a neutral manner. I do not give less weight to his opinion because he advanced that opinion rather than maintaining a neutral position. I also note he was chosen with the input of both sides. Both parties listed Rypma as a witness and both examined him at trial.

Susan advances the opinion of her hired expert; Steven Dawdy, Ph.D., was more credible. Dawdy was of the opinion Susan would be of more benefit to the children socially, and with her they could develop better social skills. Susan points to evidence Richard has not participated in a large number of social activities as support for her position. Dawdy was of the opinion the children needed daily contact with Susan to develop these skills. The children had been in daily contact with Susan during the marriage, yet they have social problems. Dawdy does not explain the relevance of this factor. The children were placed in Susan's temporary physical care on July 25, 1996.

I cannot reach the majority's conclusion that Susan's three or more affairs during the marriage and her relationship at the time of trial, which brought her male companion to her bed and his children into her home, did not have an adverse effect on the children. The ease with which Susan slips in and out of romantic relationships raises questions in my mind as to her stability. In putting her

immediate attention to romantic relationships following separation, she is less available to meet the children's emotional needs.

The children have excellent academic skills, but lag socially. One child, Richard, has developed behavioral and developmental problems. He has problems interacting with other children as well as responding to others' feelings and ideas. He is weak in social reasoning. Many of the same characteristics are present in Robert, the second child, though he is more socially outgoing than his brother. Susan's election to bring other male figures and their children into her life and the lives of her children at a time when the children are under the stress of the divorce, decreasing the time and effort she has to be involved with her children, weigh heavily in my opinion against her claim for primary physical care.

The majority has elected to address the issue Richard raised that Susan's use of a domestic relief petition for an improper purpose should be considered against her position on the issue of primary physical care. Susan filed a petition for dissolution in April 1996. She testified at that time she wanted Richard to leave the home, but an agreement was reached wherein the parties would share the home and custodial responsibilities for the children. On July 9, 1996, Susan charged Richard with domestic assault claiming he had pushed her with his feet. The problems occurred after Richard taped a telephone conversation between himself and the girlfriend of a man from New York who Susan had a relationship with from April 1996 to September 1996. Susan subsequently filed a petition for relief from domestic assault on July 10, 1996 seeking, among other things, to restrain Richard from the family home and granting her temporary custody. An order entered the same date granted the requested relief. A hearing was held. Both parties testified. A permanent order issued July 25, 1996.

The criminal charge for domestic assault that formed the basis for the petition was tried to a jury and on November 17, 1996, the jury found Richard "not guilty."

Before trial, it was said of the domestic abuse issue:

SUSAN'S ATTORNEY: Your Honor, prior to commencement of trial, we had a session with the Court in camera and discussed a number of issues. With respect to the question of the domestic assault, it's our understanding that the Court has ruled that the parties will not be getting into evidence regarding that but that the Court will take judicial notice of the fact that Richard Rebouche was found guilty in a 236 hearing of domestic assault and that Richard Rebouche was acquitted in a criminal proceeding alleging assault.

THE COURT: That is correct.

I find from these statements the parties stipulated the trial court considered it a non-issue; consequently, I would treat it in the same manner on our appellate review.

The record supports a finding the reasons advanced by the court-appointed evaluator are valid. Susan's decision to become involved in a series of relationships indicates at this critical time in the children's lives she gives great priority to her own needs. The time and effort necessary to find and nurture outside relationships takes time and effort away from what time Susan has available to give her children. Susan has elected to give a priority to her need to establish social and romantic relationships with other men at a time her children are extremely vulnerable and need considerable individual attention from their custodial parent. The choices Susan has made in life show she does not have the available time to meet her children's extraordinary needs at this time. Richard has put the children's current emotional needs ahead of his own. His priority at this time is his children. These factors show him to be the better primary care giver. I would establish the same visitation for Susan as was established for Richard. I would remand to the trial court to figure Susan's child support obligation.

Richard also challenges that portion of the decree which awarded Susan's pension valued at $27,365 to her, and his pension valued at $19,000 to him. Susan argues there need not be an equal division, she is assuming more debt than Richard, and she is older and

will have less chance to contribute to her pension.

This is a marriage that calls for a nearly equal division of assets. *See In re Marriage of McLaughlin,* 526 N.W.2d 342, 344 (Iowa App.1994). To arrive at such a result, pension benefits should be equally divided through a qualified domestic relations order. I would modify to so provide.

I agree with the majority on the other issues.

HUITINK, J., joins this partial dissent.