Marjorie Elizabeth HULBERT, a child, by George Hulbert and Marjorie Elizabeth Hulbert, parents and next friends,. Appellants,

v.

Willis Dale HINES and Ann Hines, Appellees.

No. 54021.

Supreme Court of Iowa.

June 23, 1970.

DeWayne A. Knoshaug, Clarion, and Connolly, Connolly & Bray, Council Bluffs, for appellants.

Archerd & Johnson, Clarion, for appellees.

MOORE, Chief Justice.

This is a habeas corpus action by George and Marjorie Elizabeth Hulbert, husband and wife, to regain custody of their daughter, Marjorie Elizabeth Hulbert, age 3 years at first trial time, from defendants, Willis Dale and Ann Hines, the child's uncle and aunt, with whom she lived almost constantly from the date of her birth. Mrs. Hulbert and Mr. Hines are sister and brother. The trial court held it was for the best interest of the child that her custody be awarded to defendants with the right granted plaintiffs to have their daughter on the third Saturday of each month from ten a. m. to four p. m. and to have the child with them during the months of July and August each summer for a period of two consecutive weeks. Plaintiffs have appealed.

While this action, which was filed and tried in equity, was brought on behalf of the minor, Marjorie Elizabeth Hulbert, we will refer to her parents as plaintiffs. The uncle and aunt will be designated as defendants.

As in most child custody cases we are here faced with an unusual and perplexing situation fraught with difficulties and uncertainty. We can only reason from hu-

man experience where the probabilities lie and rule according to what we believe will best serve the welfare of the child.

The history of this litigation is unusual in that on August 24, 1967 the father commenced a habeas corpus proceeding which was tried before the Honorable E. J. Flattery, Judge of the Eleventh Judicial District, commencing September 25, 1967. On October 13, 1967 the trial court filed findings and conclusions which included: "This opinion is not an adjudication against the rights of Mr. and Mrs. Hulbert to custody of their daughter at such future time as showing is made as to the fitness of the mother and it will be in her best interests to be returned to her natural parents. * * *

"If and when such time arrives then the interesting legal questions posed by the Bannister and Garvin cases can be argued and if possible resolved by the court."

Judge Flattery decreed: "1. Plaintiff's petition for change of custody is denied without prejudice to reassert his rights to custody at some future date if he so desires.

"2. Plaintiff and his wife are entitled to rights of reasonable visitation at reasonable times and reasonable hours."

On October 25, 1968 plaintiff-father filed a substituted habeas corpus petition in which the mother joined wherein the prayer was repeated that the child's illegal restraint be terminated and the natural parents be given custody.

Further proceedings on the issues came on for trial February 11, 1969 before another Judge of the Eleventh Judicial District, the Honorable Mark McCormick. Some of the witnesses who testified in the first hearing also testified in the second. Much additional evidence was introduced by plaintiffs. Defendants as part of their evidence introduced into the record a transcript of all the evidence taken on the first hearing. This includes many exhibits which have now been certified to us.

Thus the record before Judge McCormick and this court includes the evidence taken in both hearings.

The factual situation must be stated at considerable length as each case of this nature must be determined according to the circumstances peculiar to it alone.

Plaintiffs, both high school graduates, were married, each for the first time, on February 27, 1945. Five children were born to this marriage, Hubert, age 23 at trial time, David, born October 19, 1947, Lawrence and Norman, twin boys, born December 4, 1956 and their only daughter born April 24, 1964. Her name as shown by the birth certificate is Marjorie Elizabeth Hulbert. As pointed out infra she is called and known only as Liza Hines in defendants' home and in the community of Clarion, Iowa.

Since the summer of 1945 plaintiffs have lived in a six-room remodeled air conditioned house in Council Bluffs, Iowa. It is moderately equipped and furnished. They own an automobile and have a savings account in a credit union. Their only indebtedness is a balance of $600 owed to the county for institutional care of the mother. The father has been steadily employed as an electrician for the Union Pacific Railroad since 1945. At the time of the second hearing his salary was $629 per month. The two older boys always lived in the home with their parents until each entered military service. They apparently were properly reared and became good citizens. The twin boys have always lived in their parents' home and no attack is made on the care and attention they have received.

In 1952 the mother first experienced mental illness. She became confused and lost contact with reality. She was confined for a short time in a private hospital in Council Bluffs. She was hospitalized in the Mental Health Institute at Clarinda in 1964, 1966 and 1967. Her hospitalizations have been for what is referred to as "Schizophrenia Reaction Paranoid". For treatment she received insulin, chemother-

apy and electric shock treatments. Her hospitalization was not for long periods of time. The last was in August 1967, when she was released by the doctor at the mental health institute as cured.

The birth of the twins was subsequent to the mother's first hospitalization. Thereafter the parents continued to maintain their happy family relationship and care for the four boys then in the home. The only discord between the parents was one occasion when the mother struck the father with a cooking utensil. Neither parent ever experienced any serious difficulty with discipline of the boys.

In January or February, 1964 defendants visited plaintiffs' home and voluntarily suggested their willingness to help care for plaintiffs' expected child. The father advised them he believed no help would be needed. At the daughter's birth, April 27, 1964, the mother experienced considerable physical difficulties and an emotional upset which required hospitalization in the mental institute.

Faced with the problem of caring for the twin boys and the baby the father first took the baby to the house of the mother's parents in Council Bluffs and then a week later took her to defendants' home in Clarion, a distance of at least 200 miles. It was agreed defendants would care for the child until the mother was able to do so.

During the mother's confinements at Clarinda the father, accompanied by the twin boys, regularly drove to defendants' home to visit the child. These visitations averaged about one weekend per month. The mother was released from the mental institute on August 9, 1964. She experienced difficulties in July, 1966 and was again sent to the mental institute for care and treatment where she remained until September 14, 1966. She again was admitted to the mental institute on May 17, 1967. She was allowed temporary visits to her home and was released August 15, 1967 as "Discharged Recovered" by Doctor Karl A. Catlin, M.D., Superintendent of the Mental Health Institute.

Since her release in August, 1967 the mother has assumed full responsibility as a homemaker, including caring for the twin boys, cooking, washing, grocery buying and helping maintain the happy family relationship. The entire family made several trips to Clarion for visitations with the daughter.

The father on June 1, 1964 purchased a 20-year pay life insurance policy on the daughter. He has paid the annual premiums of $48.54 and the policy is in full force and effect. On October 17, 1966 he started a savings account in the name of the daughter and made several small deposits thereafter. The amount thereof at trial time was $161. She was also covered with other members of the family by Blue Cross and Blue Shield insurance in force at the father's place of employment. From 1964 until 1967 the father paid defendants $20 per month to cover part of the daughter's expenses. This amount was agreed upon between the father and defendants. On occasions he offered to pay more but was advised by defendants it was not needed. In 1967 at defendants' insistence and after a $20 payment was returned to him, the father ceased making the payments. For tax purposes defendants listed the child as a dependent.

On visits to see his daughter the father brought her many gifts and showed a willingness to furnish any necessary items to assist in the child's care. He bought and delivered to defendants' home a baby bed mattress, a stroller, a jump chair and a play horse.

Not the slightest criticism is found in the record of plaintiffs' conduct as to what they have done in their relationship with each other, their children at home and their daughter. The only question raised is the child's welfare if placed in the parents' home in view of the mother's mental illness history. Since August, 1967 plaintiffs and the twins have enjoyed a close

family relationship. They have vacationed together in Niagara Falls, Tennessee, Colorado, Canada and have spent much time together. The twin boys get good grades in school, are active in Boy Scouts and regularly attend Sunday School.

The break in the existing friendly relationship between plaintiffs and defendants came in the early summer of 1967. They had arranged for additional visitation of the parents with the child in defendants' home preparatory to the child being taken to plaintiffs' home. Unfortunately the mother then had a gall bladder operation following by an emotional upset and confinement to which we have referred supra. Defendants thereafter took the child on a trip to Texas at a time when the father was to come and get her. Defendants on their return insisted a welfare worker investigate plaintiffs' home and report whether it was proper for the child's return. That was done and a favorable report made. Defendants then asserted the child should not be returned until it was established the mother was cured. They expressed concern of the possibility of reoccurrence of her emotional troubles. A family conference was held at which defendants insisted they would not release the child as the mother was not cured. This litigation followed.

Mrs. Sylvia Hines, mother of Mrs. Hulbert and Mr. Hines, related her close contacts with her daughter's illness over the years and the "wonderful change" which she had shown since 1967. "She was more herself". The grandmother's testimony includes:

"Q. When the child first came to live with them in the Bill Hines' home, did you have an understanding of how long, or what time the child was to go back? A. Until she was able to take care of it; until the doctor said she was able to take care of the baby, and then she could have it.

"Q. Do you feel that she is presently able to carry out the duties of a mother for a 4-year old daughter? A. Well, she is taking care of the boys good and they are not running around dirty or anything. I think she could. I'm sure she could take care of it.

"Q. During the time the boys have come up to visit you, have they been well kept and well mannered? A. Yes, they have."

Mrs. Stella Hulbert, the husband's stepmother, a resident of Council Bluffs, and Ruby Allwine, his widowed sister, each testified the mother had problems in 1964 and 1965 but that starting in 1967 there was a wonderful change and the mother was a good cook, housekeeper and homemaker. Each opined the mother was capable of performing the duties required for the care of a four-year old child.

Gerald Matz, Pottawattamie County social worker, who had specialized in the study of mentally disturbed and retarded persons, made a study of plaintiffs' home and testified he observed a good atmosphere in the home and a good relationship between the boys and their mother. His testimony includes:

"Q. Based on your experience and your observation of the home and the people in the home, do you feel that this is a propper home to raise a four-year old girl? A. I do."

Dr. Bernard Kenney, Council Bluffs psychiatrist, who had been a treating doctor of the mother over a period of several years, died January 23, 1969. His affidavit signed August 24, 1967 stated the mental and physical condition of the mother was satisfactory to take care of her daughter as homemaker and mother.

The testimony of Dr. James D. Mahoney, M.D., a treating and consulting psychiatrist and a member of the Iowa and American Psychiatric Societies, was introduced by deposition. He had known and treated the mother for several years. His testimony includes:

"Q. Now, based on this examination and your past dealing with her, what is

your opinion of her current condition as to her mental health and emotional stability? A. Well at the present time I can find no evidence of any mental or emotional illness in this patient. She is quite calm. Her thinking is quite organized and she appears to be quite normal.

"Q. You feel that she is capable at this time of providing proper maternal supervision of a four-year old girl? A. Yes. I see no reason from my observation of this woman why she couldn't have—adequately take care of a four-year old child.

"She has other children currently in her home, they are preteen or early teenagers, she talks about them in a relative normal manner. From my examinations, records and history I know that she was hospitalized first in St. Bernard's and I think on two occasions she was in the Mental Health Institute at Clarinda. I do not have the exact dates.

"I saw her originally in '63 or '64, then I have not seen her again until July 17th when Dr. Kenney asked me to see her and then again recently on the 4th of February here in my office.

"Q. What was your treatment of her on July 17, 1967. A. At that time it was just an examination to determine her current status and to see if anything else should be done for her and at that time she was on medication and I just suggested that since she was getting along so well she continue this same medication. The medication was a tranquilizer, comes under the general category of tranquilizer.

"Q. What was your diagnosis of her at that time, Doctor, on the 17th of July, 1968? A. At that time in view of her past history I would say that she—at that time she appeared to be normal and the only diagnosis I could make was that she had recovered from a schizophrenic attack.

"Q. Would you describe for us what your examination consisted of on the 17th of July? A. I reviewed the records and a psychiatry interview which consists of an attempt to determine the current status of the individual in which she will go into her thinking, her general activity.

"Q. You saw her then next on February 4, 1969. What did you notice at that time: Did you conduct an examination? A. Yes. I had another psychiatric interview with her in which I followed pretty much the same procedure and now—

"Q. Would you describe the examination which you conducted on February 4th of this year? A. Well, again, it's a review of her past situation and, again, an examining of her current status in which, again, you attempt to observe and interpret her current behavior; her thinking, and at that time I talked also with her husband and asked for a corroboration of my observations.

"Q. Would you state what your observations were? A. Well here we have a woman 40 some years old, female, that was appropriately dressed and pleasant and agreeable; cooperative. Her affect, which means her way of relating to people —and her thinking seemed to be quite normal. She showed no abnormalities in her thinking. She had currently been taking care of her husband and children and functioning adequately and this contact was from her description and the husband's description. And in general I could find nothing abnormal in my examination of this woman at this time.

"Q. Okay: Based on your examinations of her; your personal knowledge of her past history, do you have an opinion as to whether or not, to a reasonable degree of medical certainty, whether this lady is cured at this time? A. If the definition of cured is the fact that this individual has no signs or symptoms, yes.

"Q. Do you have an opinion based on reasonable medical certainty as to whether or not this patient is able to take care of and properly care for and rear a four-

old girl child? A. I could see no reason why she shouldn't be adequate to take care of a child.

"Q. Do you have an opinion, Doctor, based on your examinations and on reasonable degree of medical certainty whether or not this patient is, at this time mentally and emotionally stable? A. Yes.

"Q. What is that opinion? A. My opinion is that she is stable at this time.

"Q. Is it your opinion, Doctor, that this patient will continue to be stable in the future? A. Of course, this is difficult to answer positively because anyone of use could have something happen that could create an emotional psychotic illness at anytime. One big factor in this woman's life is her husband. He is a stable, understanding individual. And the fact that she has been able to get along outside of the hospital for a year and a half or more, as much as you could say about anyone that she should be able to get along without any future difficulty."

Plaintiff-father's testimony covers the history of his marriage, the family, his wife's illnesses and his relationship with defendants. He stated the baby was left with defendants with the understanding she would be left there until the mother was well enough to take care of the child. He traced the history of the mother's illness and of her recovery and improvement since August, 1967. He was sure the mother could care for the daughter.

Plaintiff-mother testified regarding the state of her health since August, 1967, her activities in caring for the twin boys and the performance of her duties as a homemaker. She stated her health was good. She took five pills a day to calm her nerves. She expressed a strong desire to have the daughter join their happy well adjusted family.

The spokesman for defendants on most occasions and in many letters to the father was the aunt, Ann Hines. She volunteered to help before the baby's birth and carried most of the responsibility of making arrangements with the father for the baby's care. She, of course, was the one to devote much time and attention to the child. With the help and love of the other members of her immediate family the aunt gave the child loving care. Plaintiffs make no attack on the care given the child in defendants' home.

It appears the child was baptised in the church at Clarion which was attended regularly by the aunt. The baptism took place a few months after its birth and without the knowledge of plaintiffs. The child's name is carried on the church rolls as Liza Hines. At the first hearing the aunt testified she had the child "baptised Liza Elizabeth Marjorie Hulbert as our— we as foster parents".

Defendant aunt's cross-examination includes:

"Q. Did you ever at any time instruct Lisa to call you anything other than mother and father, or mom and dad? A. No, I never did.

"Q. You at no time informed her what the situation that caused her to be living with you was? A. To start with she was so small. It was natural for her to call us mother and dad. This is what the other kids called us. When the time came she wouldn't be with us, I figured we would tell her in plenty of time, which of course was in '67, that we was planning on giving her back, yes. But at that time I would have told her what to expect. I wouldn't have sent her off not knowing what was going on. Lisa is a different child.

"Q. Until June of 1967 you intended to give her back and she was just staying with you until—A. When there was proof that her mother would be well enough to take care of her with no doubt in my mind at all, yes; I would have given her back.

"Q. But as you previously testified, there will always be a doubt in your mind. A. Yes.

"Q. So this can never be removed in your mind no matter what the doctors say. A. No, if she really shows that there is a chance, and if it's for the best of Lisa—after you think about them and you think about me and you think about Lisa, and how it is going to break her heart—and then you think of her future.

"Q. Okay, what you are trying to say then is, if Mrs. Hulbert is recoverd you still would be receptive to giving her back, is that right? A. If she was recovered for a period of time without medication I would consider her going, yes. The last time she was without medication for four months she went back.

"Q. So if the Court finds that she is recovered, then it would be your feeling that she should go back? A. If she could be without medication for the required period of time that a doctor suggests she be without it, yes."

Defendant uncle at trial time was a Clarion police officer working from four p. m. to midnight at a salary of $485 per month. Defendants also had income from a rental house. Defendants have three children, Rochelle, Debra Ann and Billy, ages 18, 16 and 15 respectively at the time of the first hearing, All members of defendants' family loved "Lisa" and treated her as a member of the family.

Reverend Orlan Mitchell, minister of the Congregational Church at Clarion, related his acquaintance with defendants and Lisa. He stated she had been given loving care in defendants' home. He opined "to wrench her from this environment would be a traumatic experience that might endanger her personality".

Reverend Mitchell, a neighbor and a fellow police officer, each testified the Hines' home was beautiful, well taken care of and a happy home.

Mrs. Faith Knutson, Wright County public welfare worker, testified in the first hearing that her study of defendants' home disclosed a very good rapport and "I found Mrs. Hines to be a good, warmhearted, outgoing personality, most interested in the welfare of her children, and needs. I think that Mr. and Mrs. Hines are most interested in their home life because they had built the house together, and they had built-in cupboards and desks in both their children's rooms to make it more convenient for their children, and a place for them to study in the other part of the house. They each had their own bed and own dressing table, and desk, and so forth. As I said I found the family very warmhearted and outgoing, and most interested in their own children and also in this child."

The testimony of Dr. Richard Young, M.D., a general practitioner in Clarion with some study of psychiatric and emotional behavior includes:

"Q. Based on your experience and training, does a recovery from a Schizophrenic attack mean that they are cured? A. From the disease itself?

"Q. From the disease itself. A. I do not feel there is a definite cure for this disease.

"Q. If they have a further attack, would the drugs be used for an indefinite period of time? A. Normally on third attack most treatment centers will continue this medicine indefinitely for the rest of their life, or for whatever is needed.

"Q. Remission—would you describe what you mean by remission and Schizophrenic type, and someone that's been involved with this type of mental illness? A. Briefly, Schizophrenia is a disease which takes the person out of reality and into a fantasy world. There are all varieties and stages of remissions and exacerbations. They can have a partial remission where they are able to operate in society, and still have hallucinations and delusions and things like this. If they go clear over into a complete withdrawal from reality, this is called a break—or a new attack. Now, with drugs they can be—as long

as they are taking adequate doses, they can be made to operate in society and according to society's rules. But this does not mean that they are cured; they are in abeyance or they are being treated and under control." He had never examined or treated plaintiff-mother. He further testified a child should be established in a home early and disturbed as little as possible.

Dr. Robert C. Eaton, defendants' family doctor who had seen Lisa for routine checks and for immunizations stated she had been given the usual medical care of a child her age. His testimony includes:

"Q. Now you have observed this youngster and you have observed and are acquainted with the Hines people during your practice here in Clarion. What is your judgment as to the advisability of taking this child out of the Hines home? A. Well, I would say that the home that she is now in is a good home. I think that the child is happy, from what I have seen of her. I think that if she was taken into strange surroundings, I think that at her age this would upset her."

Since filing of the briefs in this appeal an analysis of the applicable legal principles has been published in an Annotation entitled "Award of Custody of Child where Contest is between Child's Parents and Grandparents", 31 A.L.R. 3rd 1187. The opinions of this court are cited under the many sections thereof. We therefore need to state only briefly our established applicable principles.

■ I. This being a habeas corpus action involving custody of a child it is reviewable do novo. Garvin v. Garvin, 260 Iowa 1082, 1089, 152 N.W.2d 206, 211; Halstead v. Halstead, 259 Iowa 526, 531, 144 N.W.2d 861, 864, and citations.

II. Although we must give weight to the trial court's findings, and recognize the question of child custody is addressed to the sound discretion of the court, it must also be remembered that our duty is to review such a matter de novo and, where the record is so extensive as it is here, we must decide the involved questions ourselves. Willey v. Willey, 253 Iowa 1294, 1297, 115 N.W.2d 833, 835; Andreesen v. Andreesen, 252 Iowa 1152, 1156, 110 N.W.2d 275, 277.

■ III. There is a presumption of parental preference as to custody of a child which exists by statute. Section 633.559, Code, 1966. In cases of this nature, however, the presumption is rebuttable as the governing consideration must be the best interest of the child. Rule 344(f), par. 15, Rules of Civil Procedure. Halstead v. Halstead, supra.

For brevity we repeat the following from Painter v. Bannister, 258 Iowa 1390, 1396, 140 N.W.2d 152, 156: "A father should be encouraged to look for help with the children, from those who love them without the risk of thereby losing the custody of the children permanently. This fact must receive consideration in cases of this kind. However, as always, the primary consideration is the best interest of the child and if the return of custody to the father is likely to have a seriously disrupting and disturbing effect upon the child's development, this fact must prevail. (Citations)."

The facts here are vastly different than those in Painter v. Bannister, supra. Here plaintiff-father failed not in any respect to protect the welfare of his daughter. We agree with this finding by Judge Flattery. "George impressed me as being a kind, hard working father and a man who has borne the cross of his wife's illness very well."

The only evidence against the presumption in favor of the plaintiff-mother is the question of her mental health. She has carried out the duties of a mother and homemaker since August, 1967. The fact she is required to take medication daily does not impress us as sufficient to overcome the presumption in her favor as a parent. Past performance and much tes-

timony, including that of Dr. Mahoney, strongly supports a conclusion she is now well able to properly care for her daughter. We so conclude. This conclusion is supported by our holdings in Vanden Heuvel v. Vanden Heuvel, 254 Iowa 1391, 121 N.W. 2d 216; Willey v. Willey, 253 Iowa 1294, 115 N.W.2d 833; McKay v. McKay, 253 Iowa 1047, 115 N.W.2d 151 and Wood v. Wood, 220 Iowa 441, 262 N.W. 773.

The question of whether moving the child from the home of defendants to that of plaintiffs would be so disturbing and disrupting as to require a finding her best interest would not be thereby served has been given our serious consideration. Apparently defendants did not consider this an overwhelming matter when they agreed to such a change early in 1967. This child will suffer a rather traumatic experience if left in defendants' home. She knows and addresses them as her parents. She must soon learn her name, by which she is known in Clarion, is not Lisa Hines but her true name is Marjorie Elizabeth Hulbert. She must soon learn her natural parents live in Council Bluffs and the twin boys are her brothers. No doubt she will experience some upset by being returned to her parents but we conclude her best interest now and in the future will be served thereby.

Under the facts here two good homes are available to this child. Defendants have rendered outstanding service in her behalf. Their love, affection, attachment and their resistance to her leaving their home is understandable but in a matter of this kind regardless of what the decision is, someone is hurt. We express the hope it is not the child and that the parties lay aside any ill feelings which may have developed and reestablish a friendly relationship.

The judgment and decree of the trial court is reversed and this cause is remanded for entry of an order sustaining the writ.

Reversed and remanded.

All Justices concur.