# IN THE COURT OF APPEALS OF IOWA

No. 16-1178
Filed June 7, 2017

IN RE THE MATTER OF THE GUARDIANSHIP OF M.E.,

**CAMILLE PERSON f/k/a CAMILLE KOEHN,**
    Petitioner-Appellant,

**vs.**

**MARIE ELG and STEVEN ELG,**
    Respondents-Appellees.
_____

Appeal from the Iowa District Court for Dallas County, Richard B. Clogg, Judge.

A mother appeals the denial of her motion to terminate a guardianship.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

Maureen C. Cosgrove and Kimberley K. Baer of Baer Law Office, Des Moines, for appellant.

Earl B. Kavanaugh of Harrison & Dietz-Kilen, P.L.C., Des Moines, for appellees.

Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**DANILSON, Chief Judge.**

Camille Person, formerly known as Camille Koehn, is the mother of a child, M., born in 2008. Camille's parents, Marie and Steven Elg, have been the guardians for M. since Camille stipulated to a consent order placing the child in Marie's custody in 2008. Camille filed an application to terminate the guardianship in 2015, which the court denied. Camille now appeals, asserting Iowa law governs the termination of the guardianship. She argues the court erred in finding the guardians had overcome the parental preference, in giving weight to the counselor's and guardian ad litem's (GAL's) opinions that termination of the guardianship would pose a disruptive effect on the child, and in failing to adequately focus on the child's best interests.

Because the Elgs have not overcome the parental preference by clear and convincing evidence, we reverse and remand with instructions that the court determine and implement a transitional plan to return the child to Camille's custody.

**I. Background Facts & Proceedings.**

On March 25, 2008, a court in Tennessee filed a consent order,[1] signed by Marie Elg and Camille Koehn (now Camille Person), which provided:

> 1. That [Marie and Camille] have been fully advised that to modify this final custody decision would require a material change in circumstances which makes a change in custody in the child's best interest even if they are the legal parent of the child(ren),

---

[1] At a later date, Steven Elg was added as a legal custodian of the child.

Camille understood the consent order was an alternative to the Tennessee children's services taking custody of the child and placing M. in foster care. Camille stated she believed the consent order was temporary "until I work on my mental health and alcohol and drug issues."

2. That it is in the best interest of the minor child that the petition be sustained and that custody be divested from [Camille] and that care, custody, and control of minor child be awarded to [Marie] and that a hearing before the court is hereby expressly waived.

3. That they are aware that on [sic] this agreement is based the Order of this Court, and that failure to comply herewith, without just cause, places them in contempt of court and subjects them to such action as the Court deems proper within its jurisdiction.

Marie was granted the "authority to consent to any education, medical, surgical or hospital care necessary in the best interest of the child."

Camille sought visitation or a return of custody of M. in June 2009. After a hearing, the Tennessee juvenile court referee (now magistrate) found:

The mother testified that the grandparents are moving to [Iowa] and want[] her to move there with them. She also stated that their visitation is unreasonable and too restricted. The mother also testified that she is currently residing in Red Bank in an apartment which she shared for two (2) weeks with an exchange student. She worked for Panera Bread part-time at first, but now she is full-time. She has attended some AA meetings, completed a domestic violence program, and her Probation Officer indicates in a letter that she does not need treatment. She is currently on probation until 2010, for violation of probation. There is a contempt of Court charge, relating to domestic violence, against her husband with a pending Court date. She further stated that she has changed since 2008, and feels she is ready to take full responsibility of her child. She admits that she has a chemical imbalance, and some unresolved emotional issues from her childhood.

During cross-examination of the mother it was brought out that the mother is presently under the care of a psychiatrist. She has been diagnosed with suffering from bipolar disorder and she was prescribed 400mg lithium to be taken twice daily, and medication to help with sleep, which she has not been taking. Since the consent Order which she signed in March of 2008, the mother has lived in four (4) different locations. She had been living with a married man for a period of time last year. She admits that her husband, Michael Koehn is a drug addict, and was with her on the night in March 2008, when she overdosed on a combination of Zanax, cocaine and alcohol. He also has a criminal record and is currently incarcerated. She admits to being afraid of him, and she also admits to having an addictive personality having used drugs since the age of fourteen (14). She admits that she has not filed for

divorce from her abusive husband as she told the Court she was going to do.

The maternal grandmother testified that the mother and the married man who she is currently living with came to the mother's place of employment and got into a fight with her over a gun which he accused her of taking. He then pointed the gun at himself and threatened to kill himself, and this was very concerning to her as to the safety of her granddaughter in the mother's custody. She feels the mother is a good person and will not deliberately harm her daughter but she is concerned about the mother's judgment and the people she chooses to be around.

Based upon proof and testimony presented, and the entire record, the Court found there has been no material change in the child's current circumstances to warrant a custody change and it would not be in the best interests of the child to change custody at this time.

Camille requested a rehearing before a district court judge. At the close of Camille's presentation of her testimony, the court granted the Elgs' motion for directed verdict. The court stated on the record:

And to be frank about it, I don't blame your parents at all for asking questions. You made poor choices. By your own admission, you made poor choices about a man in your life, a man from whom you're still not divorced. You did not feel that that was a priority yet, to get that cleaned up, get a fresh start. But instead you're continuing, there's a continuum here of your lifestyle with a man that has had a relationship with you.

And what bothers me and bothers your parents is that this man is also one that you've had to take out an order of protection on. It's a cycle that's still present in your life. He may be a good person, but he has flaws as well if what you told me about him is true.

Do you think this man loves you if he's circulating these pictures of you out here? Do you think he's prioritized your well-being? No. If it's a matter of the two of you not getting along well enough that you got to move out, that he has to be charged with something, he's not—he's in that same pattern as the other man. And you know from what you went through with him that's not good for you. And it's certainly not good for your child.

Now, what you do on your own is up to you. What you do when you're asking me to consider placing a child back with you takes on something else. You have to be scrutinized very differently about this because your child's well-being and safety come first. I want you to take care of yourself for yourself. I would

like for you to take care of yourself for your child, but as long as you are continuing in this same lifestyle—even though you've made some positive changes, you haven't taken it to the point that you're trustworthy in making good judgments yet about your child.

Because the Elgs had moved to Iowa, the court ordered that they pay for transportation and ensure visits occurred between Camille and M. at least every other month. The court prohibited the child from being in the home Camille shared with her current paramour.

So this will be for time you spend with your child. And then at such point in time and if you make these changes in your life and a year or so from now and you can show you've got your own residence down here, you're not dependent on this man, you're not continuing in these same circumstances that brought you to the shape you're in right now, then those are the things that you can always come back and look at.

In 2010, several months after the Elgs moved to Iowa with M., Camille moved to Iowa as well. Camille participated in M.'s life—first sporadically and then by 2013—on a consistent basis.

Since 2008, Camille has obtained her GED, a cosmetology license, and a certified nursing assistance certificate. She has held full-time jobs. Camille had a set back in 2012, when she used an illegal substance, was hospitalized for evaluation, and entered into outpatient treatment. In 2013, Camille married Travis. They reside in a small town about two hours away from where Travis found full-time employment as a police officer. Camille and Travis had a child in 2015.

In January 2015, Camille registered the Tennessee consent order in the Iowa district court and filed an application to terminate the guardianship and have

custody of M. returned to her. The Elgs resisted the application.[2] A temporary visitation order was entered in March 2015, which provided Camille set visitation, including overnight visits every other weekend. That court-ordered visitation has continued.

A hearing was held in October 2015. At the time of the hearing, Camille was doing well in an accelerated nursing program working toward becoming a registered nurse. Camille reported she is managing her anxiety and depression with proper medications and regularly meets with her psychiatrist and doctor. All parties agree Camille has shown increased maturity and stability, particularly since 2013.

The child's GAL, Kara McClure, testified it was not in the child's best interest to be reunited because it would be psychologically harmful, noting the child is "already going through anxiety." She explained:

> The past couple of months, as [M.] has become more aware of conflict and that there's a possibility of her life may be undergoing change, I think that's played out. I think she's had a lot of problems with that. That has affected her at school. It's affected her at home, and it's deeply affecting her. It's affecting her in therapy sessions with [Susan Gauger].
> . . . .
> . . . She is already—I think it will be disruptive and damaging to her, and so I didn't approach this as to whether Camille can be a suitable parent to [M.] I approached it as what's best for [M.], and because I find there is risk of harm to [M.] psychologically to be removed, I focused more on that.

---

[2] The Elgs filed a motion to dismiss asserting the court did not have jurisdiction. The Iowa court denied the motion to dismiss, finding "the Tennessee guardianship that was filed in this Court is a guardianship akin to a probate guardianship under Iowa law and that the district court sitting in probate has jurisdiction to determine if the guardianship should continue."

Susan Gauger, a licensed clinic social worker and the child's therapist, testified[3] the child was "probably one of the most delightful children I've had the opportunity to meet." She described M. as "a bright, inquisitive child who is always very much concerned about doing what's right." Gauger also described M. as "highly sensitive" and one who "can read other people's behavior and feelings and concerns very readily." Gauger stated the Elgs' bond with M. was "parental." With respect to M.'s bond with Camille, Gauger testified:

> Well, I think that [M.] also has a bond with her mother. Her mother has been part of her life all along, and I think that she knows her mom is her mom. And I think that [M.] is kind of at that age right now where she wants to maybe experience more of her mom's time, and she also has a little brother now, and so that's been kind of a curiosity, another way for kind of bond her to her mother as well.
>
> I think that when she goes and stays with Mom I think she trusts that Mom will take care of her and do the things that need to happen. As far as if she has a need or if she has things that are bothering her, I think she feels she can go to Mom and talk to Mom about those.

Gauger stated she began seeing M. weekly in therapy in May 2015. Marie Elg had brought M. in because of the pending litigation. In early October 2015, Gauger informed M. there was a discussion between her grandparents and her mother and stepfather about whether M. would continue to live with the Elgs or go live with Camille and Travis,[4] to which M. responded very anxiously (i.e., she

---

[3] Due to her involvement in a serious car accident in November, Gauger did not testify until December 7, 2015.

[4] This is how Gauger described the process:

> I had [M.] with me, and I also had Marie in with me. And we spent a good bit of time talking about how—you know, that she had been going and spending time with Mom on the weekends and that—I talked with her about the fact that her grandparents and her mom and Travis had been talking and wanted to look at making some changes in where she lived because her mommy would really like her to come and live with her and Travis and that Grandma and Grandpa would really like her to stay with

curled up, covered her head with a blanket, and cried). M. asked, "[C]an't we all just live together in one big house"? Gauger was surprised by her response because the child "really did not seem to have a clue" there may be a change notwithstanding the changes in visitation.

Gauger and M. continued to address the possibility of moving in additional sessions:

> Well, I think, you know, certainly right now, as time has progressed and we've had time to get through it, during the course of the hearing I think [M.] was acutely aware that her grandparents and her parents were really upset with each other, and I think that she was—she was very confused and I think somewhat frightened by that because she knew that it was fairly intense. And she also talked about one of her uncles being around and being aware that her uncle was mad at her grandma and grandpa, and she was kind of crying saying I don't understand why people can't just love each other. And so it—I think that part was very, very tough for her.
>
> Now I think, as of the last session that I saw her, she was kind of trying to think about, okay, well, if I make this change, what would life be like if I lived with Mom and Travis and who would be there and what would my life be like and if I came to visit Grandma and Grandpa, and then what would my life be like if I stayed with Grandma and Grandpa and how would I, you know, be able to still be a part of Mom's family in Tipton.
>
> So I think she's trying to—she's trying to think about all the possibilities, and she's trying to figure out, okay, how can—how can I be okay with all of this. I think she's really working hard on that.

Gauger opined that "children who have been in a guardianship this long, it is very, very difficult for them to leave that and move into a situation that is totally new." Gauger was asked, "[W]hat kind of disruptive effect do you see that . . . a

---

them, and that because they couldn't decide between the four of them, what was going to happen and how this was—you know, how this was going to play out so to speak, that they were going to have to go [a] Judge. And I explained to her what a Judge was and that the Judge would need to be helping Grandma and Grandpa and Mom and Travis make a decision about what would happen and whether she would be continuing to stay with her grandparents or whether she would be moving to her mom's.

possible move to her mother's house if the guardianship is terminated—what possible disruptive effects do you see for [M.]?" Gauger noted that in addition to M.'s loss of her primary caregivers with whom she was "very bonded," the child would lose her school, which is "huge in her life" and included her close relationship with her cousins, as well as her friends, dance classes, and social groups. Gauger opined the losses would be "very difficult" and the change would be "very traumatic." Gauger did testify some children successfully transition back to their parent; those instances involve family and people who are "highly involved with each other" and who provide a "flowing sense of security." She expressed concern for the parties here "[b]ecause, I think, at this point the family is so fractured." Gauger testified she agreed with the GAL's recommendation not to terminate the guardianship because the child is "very bonded" and "too much time has passed." In addition, she stated, "[U]nder circumstances that are optimal, kids can make that adjustment. I'm not sure we have optimal circumstances in this case."

On cross-examination, Gauger testified, "I want to make clear to all parties involved if this child does not have an ongoing relationship with her grandparents this is going to be very emotionally damaging to her, and I think that needs to be the major consideration."

Gauger summarized:

[I]f you're asking me my professional opinion about what I think is in [M.]'s best interests, it's that she remain under the guardianship of Steve and Marie. I think it's been too long. It's been eight years. It's been too long. Does Camille need to continue to play a mother role? Yes, I think I she absolutely does. Does she need to have contact with her child? Yes. Can that be expanded? Yes.

> In my role as therapist, professionally I have to be able to talk to all sides about all possibilities that can occur in this case. One of the possibilities that can occur in this case is that the judge can disagree and can say that there's going to be a transition. I am willing to work with this family in any way necessary to make sure that they are healthy, and that if a transition needs to be done, I will help them with a transition. I may disagree with it, but that's neither here nor there.
>
> I'm going to do whatever the Court orders as a result of hearing the evidence, and I'm going to do my best to make sure that there's the best possib[le] outcome for [M.] no matter who has guardianship of her or whether she's returned to Mom or whatever the situation is.

Gauger also explained the importance of the family working together in stating:

> There are some kids who make the transition and are able to work together and do what they need to and work together to make sure that [the] child has a flowing sense of continuity between homes and people are highly involved with each other, and the child can be okay. And then there are those kids who kind of get lost in the middle.

On April 30, 2016, the district court rejected Camille's request that the guardianship be terminated, concluding the Elgs had overcome the parental preference and a change of custody was not in the child's best interests. Camille appeals.

## II. Scope and Standard of Review.

Actions for the termination of a guardianship are equitable proceedings, which we review de novo. Iowa Code § 633.33 (2015); *In re Guardianship of B.J.P.*, 613 N.W.2d 670, 672 (Iowa 2000). We give weight to the trial court's factual findings, especially on matters of witness credibility, but we are not bound by them. *In re Guardianship of Stewart*, 369 N.W.2d 820, 822 (Iowa 1985).

The determination of whether a guardianship should be terminated must "be supported by clear and convincing evidence." Iowa Code § 633.551(1). "In

determining whether a guardianship . . . is to be established, modified, or terminated, the district court shall consider if a limited guardianship . . . pursuant to section 633.635 . . . is appropriate." *Id.* § 633.551(3).

**III. Analysis.**

Both parties understand that a natural parent who "if qualified and suitable, shall be preferred over all others for appointment as guardian." Iowa Code § 633.559. "Because of the fundamental constitutional rights implicated, a nonparent bears the burden of persuasion throughout guardianship proceedings, including initial appointment, modification, or termination to rebut the presumption favoring parental custody by providing clear and convincing evidence of parental unsuitability." *In re Guardianship of Blair*, No. 01-1565, 2003 WL 182981, at *5 (Iowa Ct. App. Jan. 29, 2003) (citing *In re Guardianship of Hedin*, 528 N.W.2d 567, 581 (Iowa 1995)).

A parent is not entitled to the presumption if there was a prior custody determination involving a full evidentiary hearing and the presumption was overcome. *See Stewart*, 369 N.W.2d at 823-24. The Elgs acknowledge in their brief that although Camille sought to terminate the guardianship in prior Tennessee proceedings she was not entitled to a parental presumption under Tennessee law because the presumption does not apply if the parent consented to the initial transfer of custody. Therefore, Camille is entitled to the parental preference in these proceedings. Notwithstanding, the presumption is rebuttable. *In re Guardianship of Knell*, 537 N.W.2d 778, 781 (Iowa 1995).

A guardianship may be terminated when there is no longer a need for the guardianship. Iowa Code § 633.675(1)(d). Once a prima facie showing is made

that the parent is suitable and there is no need for the guardianship, the nonparent has the burden to overcome the parental preference and establish that the child's best interests require the continuation of the guardianship. *Stewart*, 369 N.W.2d at 824; *Hedin*, 528 N.W.2d at 581; *see also Blair*, 2003 WL 182981, at *4. The first and governing concern in deciding if a guardianship should be terminated is always the best interests of the child. *Stewart*, 369 N.W.2d at 824; *see also Zvorak v. Beireis*, 519 N.W.2d 87, 89 (Iowa 1994).

Our supreme court has recognized two theories upon which a nonparent may successfully meet their burden and defend an action by a parent seeking to terminate a voluntary guardianship of a child. One method is to establish that the parent is not "qualified and suitable," as provided in Iowa Code section 633.559.[5]

The second basis upon which our supreme court has denied the termination of a guardianship of a minor child exists where the evidence reflects that, notwithstanding the parent being qualified and suitable, the nonparent has

---

[5] Our court in *Blair*, 2003 WL 182981, at *4, has previously examined decisions to give meaning to the terms "qualified and suitable," and concluded,

> Prior Iowa cases considering these concepts have generally viewed them in terms of the harmful or detrimental effect of parental custody rather than comparative judgments about the parties involved. *See, e.g.*, *Zvorak*, 519 N.W.2d at 88-89; *In re Guardianship of Sams*, 256 N.W.2d 570 (Iowa 1977); *Anh v. Nelson*, 245 N.W.2d 511 (Iowa 1976); *Hulbert v. Hines*, 178 N.W.2d 354 (Iowa 1970); *Garvin v. Garvin*, 152 N.W.2d 206 (Iowa 1967); *Halstead v. Halstead*, 144 N.W.2d 861 (Iowa 1966); *Alingh v. Alingh*, 144 N.W.2d 134 (Iowa 1966); *Painter v. Bannister*, 140 N.W.2d 152 (Iowa 1966), *cert. denied*, 385 U.S. 949 (1966); *Vanden Heuvel v. Vanden Heuvel*, 121 N.W.2d 216 (Iowa 1963); *McKay v. McKay*, 115 N.W.2d 151 (Iowa 1962); *McKay v. Ruffcorn*, 73 N.W.2d 78 (Iowa 1955); *In re Plucar*, 72 N.W.2d 455 (Iowa 1955); *Risting v. Sparboe*, 162 N.W. 592 (Iowa 1917). The gist of these cases is that considerations of parental autonomy and child welfare are not mutually exclusive. When viewed in this light, the best interest of the child is given the intended priority. *See, e.g.*, *Knell*, [537 N.W.2d at 782] (presumptive right of parental custody relinquished where welfare and best interest of child require nonparent custody) (citations omitted).

rebutted the parental preference and the welfare and best interest of the child requires custody to remain in the nonparent. *Knell*, 537 N.W.2d at 781 (observing, "[d]espite the recognition of the parental preference, in some cases we have refused to return custody" of the child). The Elgs rely on the latter theory in their efforts to resist termination and prove by clear and convincing evidence the guardianship should continue. More specifically, the Elgs rely upon the decision in *Painter*, 140 N.W.2d at 156, wherein the court stated, "However, as always, the primary consideration is the best interest of the child and if the return of custody to the [parent] is likely to have a seriously disrupting and disturbing effect upon the child's development, this fact must prevail." *See also In re Guardianship of Briggs*, No. 06-2083, 2007 WL 1827517, at *3 (Iowa Ct. App. June 27, 2007).

What is evident is that these types of custody cases are highly dependent on the individual circumstances presented. In *Briggs*, we referenced cases involving the second theory and cases akin to *Painter* in stating,

> In recent years, the *Painter* standard has been difficult to meet, and the presumption favoring the natural parent has prevailed. *See, e.g.*, *Northland*[ *v. Starr*, 581 N.W.2d 210, 213 (Iowa 1998)] (requiring four-year-old boy who had lost his mother be "separated from the man he has thought of as his father since infancy" and returned to natural father); *Stewart*, 369 N.W.2d at 825 (requiring return of child to natural father where father had kept in close contact, provided regular financial support, and frequently visited during the eight years child had lived with guardians); *In re Burney*, 259 N.W.2d 322, 324 (Iowa 1977) (holding that, although placed with guardians when he was four days old, two-year-old child whose mother had visited child once or twice a month, had not been in the guardian's custody "so long that an extraordinary threat to his well-being is posed by the prospective transfer"); *Sams*, 256 N.W.2d at 573.

2007 WL 1827517, at *3.

Here, the trial court specifically found:

> Camille has made significant progress in her life. She has made exemplary positive changes in her life. She is now married and owns a home in Tipton, Iowa. [She] and her husband, Travis, have a one-year-old son, . . . that [M.] has developed a close relationship with . . . . [M.] knows and recognizes Camille as her mother and Camille and [M.] have a close mother-daughter bond. Camille is a capable and suitable parent to her son and is capable of providing the same for [M.]

However, the court went on to conclude the "parental presumption has been overcome, and it is in [M.'s] best interests that the guardianship continue and she remain in the care and custody of Steven and Marie." The court relied upon the "very strong bond" M. had with her grandparents, with whom she had lived "since she was an infant," and the child's therapist's opinion that to remove the child from her current home "would be harmful to her." The court further concluded that "continued parental contact with Camille" was in the child's best interests. We disagree with the district court that the Elgs have met their burden to overcome the parental preference here.

In *Painter*, a father had sought help caring for his child from the maternal grandparents when his wife died. 140 N.W.2d at 153. Three years later, the father sought the court's assistance in having the grandparents return his then-seven-year-old child to him. *Id.* The supreme court acknowledged the statutory parental preference. *Id.* at 156. But the court concluded the preference had been overcome and the child's best interests required the child remain with the maternal grandparents. *Id.* The court noted the child "was not well[-]adjusted" when the child came to the grandparents' care but was now "well disciplined,

happy, relatively secure and popular with his classmates, although still subject to more than normal anxiety." *Id.*

The court placed "a great deal of reliance" on the testimony of a child psychologist who had interviewed the child and the grandparents. *Id.* The court noted particularly:

> Dr. Hawks stated: "I am appalled at the tremendous task Mr. Painter [the father] would have if [the child] were to return to him because he has got to build the relationship from scratch. There is essentially nothing on which to build at the present time. [The child] is aware Mr. Painter is his father, but he is not very clear about what this means. In his own mind the father figure is [the grandfather]. I think it would take a very strong person with everything in his favor in order to build a relationship as Mr. Painter would have to build at this point with [the child]."

*Id.* at 157. The court also referenced the psychologist's opinion "the chances are very high [the child] will go wrong if he is returned to his father." *Id.* The psychologist noted the high risk to a child "who had a history of instability" and "would be removed from the only home in which he has a clearly established 'father figure' and placed with his natural father about whom his feelings are unclear." *Id.* at 158.

The supreme court in *Painter* concluded the child's best interests were served by the grandparents maintaining custody:

> [The child] has established a father-son relationship with [the grandfather], which he apparently had never had with his natural father. He is happy, well[-]adjusted and progressing nicely in his development. We do not believe it is for [the child's] best interest to take him out of this stable atmosphere in the face of warnings of dire consequences from an eminent child psychologist and send him to an uncertain future in his father's home. Regardless of our appreciation of the father's love for his child and his desire to have him with him, we do not believe we have the moral right to gamble with this child's future. He should be encouraged in every way

possible to know his father. We are sure there are many ways in which [the father] can enrich [the child's] life.

*Id.*

In *Hines*, a child's parents sought to regain the custody of their three-year-old daughter, who had lived with the child's aunt and uncle since birth due to the mother's intermittent physical and mental-health issues. 178 N.W.2d at 356. At the trial on the parents' habeas corpus petition, the evidence showed the mother's mental and physical health had stabilized, the parents were caring capably for the child's twin siblings, and the parents had maintained contact with the child. *Id.* The aunt and uncle called their family doctor, who testified changing the child's surroundings would "upset" the child.[6] *Id.* at 361.

The supreme court emphasized there is a "presumption of parental preference" and that parents are to be "encouraged to look for help with the children, from those who love them without risk of thereby losing the custody of the children permanently." *Id.* The *Hulbert* court wrote:

> The question of whether moving the child from the home of defendants to that of plaintiffs would be so disturbing and disrupting as to require a finding her best interest would not be thereby served has been given our serious consideration. . . . No doubt she will experience some upset by being returned to her parents but we conclude her best interest now and in the future will be served thereby.

*Id.* at 362.

---

[6] The supreme court noted the following testimony by the doctor,

> Q. Now you have observed this youngster and you have observed and are acquainted with the Hines people during your practice here in Clarion. What is your judgment as to the advisability of taking this child out of the Hines home? A. Well, I would say that the home that she is now in is a good home. I think that the child is happy, from what I have seen of her. I think that if she was taken into strange surroundings, I think that at her age this would upset her.

*Hines*, 178 N.W.2d at 361.

In *Sams*, a mother sought the return of her two children from the children's grandfather, who had been appointed their temporary guardian in 1974 following the mother's separation from her husband and hospitalization for surgery. 256 N.W.2d at 571. After surgery, the mother had left the children with her father for some time. *Id.* In 1975, the mother filed a petition to terminate the guardianship, which was not heard until 1976, and after a hearing the district court denied the mother's petition "at this time." *Id.*

On appeal, our supreme court noted the burden was on the grandparent to show "the best interests of the children required his appointment as guardian." *Id.* at 572. The court noted:

> Our cases have emphasized that parents should be encouraged in time of need to look for help in caring for their children without risking loss of custody. The presumption preferring parental custody is not overcome by a mere showing that such assistance was obtained. Nor is it overcome by showing that those who provided the assistance love the children and would provide them with a good home. These circumstances are not alone sufficient to overcome the preference for parental custody.

*Id.* at 573. The supreme court concluded "[n]o greater showing was made here," and ordered the guardianship terminated. *Id.*

In *Zvorak*, a grandmother had cared for her granddaughter from December 1987, when the child was ten months old, until the fall of 1992, when the child was six years old. 519 N.W.2d at 87. The mother "maintained intermittent contact with her daughter and ha[d] provided almost no financial contribution toward her support." *Id.* Upon learning the mother intended to take the child from the grandmother, the grandmother sought and obtained legal guardianship. *Id.* The mother then filed a petition to have the guardianship

terminated. *Id.* at 88. After a hearing, the district court declined to terminate the guardianship but placed the child with the mother on a six-month trial basis. *Id.* The grandmother appealed.

The supreme court reiterated, "The determination of a child's best interests . . . must take into account the strong societal interest in preserving the natural parent-child relationship. The parents of minor children if qualified and suitable are preferred over all others for appointment as their guardians." *Id.* at 89. The court noted a home study of the mother had been completed, and the investigator, though raising concerns, "found 'nothing that would indicate that [the mother] could not provide [the child] with a safe and stable environment.'" *Id.* at 88. The supreme court upheld the district court's trial-basis return of the child to the mother, stating:

> Our previous cases in this area have, for the most part, produced final determinations of the custody disputes at issue. Whether initiated via a habeas corpus petition or some other procedural device, the result has been a trial in equity resulting in a final adjudication of permanent custody. The somewhat tentative disposition that the district court made in the present case differs noticeably from that approach. It more nearly resembles the type of order invoked in juvenile court proceedings when a child removed from the custody of an unstable parent pursuant to CINA adjudication is later returned to that parent under a supervised placement. Although this type of disposition is not the norm, there is reason to approve it in the present case.
>
> It is significant, we believe, that the child's grandmother, Isabel, does not oppose, and indeed supports, the goal of [the mother] to take responsibility for her daughter's care. The dispute concerns whether [the mother] presently possesses the necessary commitment to serve the total parenting role for [the child]. Without a doubt, [the mother's] parenting ability is still open to question. On the other hand, the extent of that ability may not be accurately established unless she is permitted to demonstrate it in actual practice. The district court sought to resolve this dilemma by establishing a six-month trial period during which [the mother's] parenting commitment may be tested. We find that this was a

reasonable solution that protects the interests of both [the mother] and [the child].

*Id.* at 89.[7]

In *Knell*, the supreme court again examined what evidence would overcome the parental preference. 537 N.W.2d at 781. The court "must consider the long-range interest as well as the immediate interest of the child." *Id.* There, the trial court characterized the father's actions this way: "[Russell] has not been a part of [the child's] life for six years; his interest has at best been passive and at worst, a physical and emotional abandonment." *Id.* The father had "never sought judicial action to enforce his visitation or parental rights," and was a "stranger" to his now six-year-old child. *Id.* The court in *Knell* explained why custody should remain with the guardian:

> We have held that if return of custody to the child's natural parent "is likely to have a seriously disrupting and disturbing effect upon the child's development, this fact must prevail." *Painter*, [140 N.W.2d at 156]. Additionally, it is appropriate for the court to rely on Dr. Hayes' testimony about the possible psychological effects of separating Heather [the child] from the only family she has ever known.[8] *See id.* at 156. Our decision that [the child's] custody should not be changed is also supported by the principle that

---

[7] *See also Stewart*, 369 N.W.2d at 824, where the court stated:
> The agreed order appointing the Shepards as guardians was not the equivalent of a final dissolution or other decree looking to the long-term best interest of the child. The order was more akin to an agreed order for temporary custody entered during the pendency of dissolution proceedings. Such an order is superseded by the more permanent dissolution decree itself. Similarly, persons who procure and accept an appointment as guardian of a minor child are subject to the control and supervision of the court as the superior guardian. *In re Guardianship of Ankeney*, 360 N.W.2d 733, 736 (Iowa 1985). An involuntary guardianship would eliminate the parental preference from later consideration only if the relative custodial rights of the proposed guardian and the parent were put in issue and tried in the guardianship proceeding. *See* 39 Am.Jur.2d *Guardian and Ward* § 66 (1968).

[8] The court described Dr. Hayes' testimony:

> if a person having lawful care of a child has properly provided for a child's social, moral and educational needs for a substantial period of time and the child has become attached to that environment and those responsible for his [or her] welfare and happiness, a court is not justified in transferring that custody to another except for the most cogent reasons.

*Anh*, [245 N.W.2d at 517-18] (citations omitted). Our concern that separating [the child] from Monica [another child in the household] would be emotionally traumatic for her is supported by the principle against separating siblings. *See id.*; *Sams*, 256 N.W.2d at 573. Russell argues that Heather also now has a sibling in Arizona. Heather has never met that sister.

We have held that "a parent who has taken 'an extended holiday from the responsibilities of parenthood' may not take advantage of the parental preference for custody." *Stewart*, 369 N.W.2d at 823 (citations omitted). This case is unlike other cases where we have held a parent does not lose the preference by seeking help in caring for the children in a time of need. *See*, *e.g.*, *id.*; *Burney*, [259 N.W.2d at 324]; *Sams*, 256 N.W.2d at 573. In those cases the parents sought help with their children by temporarily placing them in others' homes, but maintained contact with the children while providing whatever support they could. . . .

This case is also different than [*In re Marriage of*] *Halvorsen* where we stated: "A court may only grant a nonparent custody of a child over a parent when the nonparent proves that the parent seeking custody is not suitable to have custody." 521 N.W.2d [725, 729 (Iowa 1994)]. In *Halvorsen* a stepfather was seeking custody of the child in a divorce action against the child's natural mother. The mother was a fit and proper custodian for the child. Also, the child had always lived with the mother, so the mother was not a stranger to the child. As a result, the stepfather did not rebut the parental presumption. *Halvorsen* did not involve removing a six-year-old child from the only home she had ever known and placing her in the home of a virtual stranger at a time when such an act would be extremely traumatic for her.

---

The primary purpose of the counseling [with Charles S. Hayes, Ph.D.] was to assist the children in coping with the loss of their mother. Dr. Hayes testified he had seen Heather nine times. He diagnosed her with an adjustment disorder as a result of losing her mother. He testified it would be very traumatic to separate Heather from either Monica or Marvin, especially so soon after her mother's death. Such a separation would likely only worsen the present psychological problems she exhibits. *Knell*, 537 N.W.2d at 781–82.

The passage of time, under the circumstances of this case, carries considerable weight in our determination. A parent who fails to develop a relationship with his or her child while that child is establishing a family relationship with a stepparent must recognize the child thereby puts down roots that are of critical importance. Courts must carefully deal with those roots in determining the child's best interest. Although Russell has the ability to provide a good home for [the child], we conclude he would not be suitable to have custody of her at this time.

*Id.* at 782-83.

In contrast to the severe emotional trauma of placing a child with a "stranger," in *Burney*, 259 N.W.2d at 324, the court found that the psychological trauma of the transfer of custody was not sufficient. The court observed, "[S]o far as the record discloses, [the child] is emotionally healthy, knows [the mother] and [her husband] well, and has not been in the [guardians'] custody so long [three years] that an extraordinary threat to his well-being is posed by the prospective transfer." *Id.*

Camille asserts the trial court gave too much weight to the opinions of the GAL and the counselor. "We give opinion testimony the weight we consider it deserves after considering, among other things, the expert's education, experience, familiarity with the case, reasons given for the opinion, and interest, if any, in the case." *In re Marriage of Rosenfeld*, 524 N.W.2d 212, 215 (Iowa Ct. App. 1994); *Painter*, 140 N.W.2d at 156-57 (considerable weight given to expert who spent twenty-five hours interviewing child); *In re Marriage of Pothast*, 539 N.W.2d 199, 202 (Iowa Ct. App. 1995) (giving greater weight to evaluations involving all relevant parties), *overruled on other grounds by In re Marriage of Williams*, 595 N.W.2d 126, 130 (Iowa 1999).

In *In re Marriage of Kriener*, No. 12-1122, 2013 WL 530864, at *4 (Iowa Ct. App. Feb. 13, 2013), this court addressed the weight to be given a custody evaluation:

> Rene offers a strong critique of the district court's reliance on the report of the custody evaluator. She contends the report was "flawed" and the evaluator developed "a bias in favor of Arnie during the evaluation process." She relies on *In re Marriage of Rebouche*, 587 N.W.2d 795, 801 (Iowa Ct. App. 1998), and *Pothast*, [539 N.W.2d at 202], for the proposition that the evaluation should have had little sway over the court's deliberations.
> Our court has recognized the value of having an independent psychologist make a recommendation regarding the physical care of the children. *In re Marriage of Harris*, 499 N.W.2d 329, 331 (Iowa Ct. App. 1993). While a custody evaluator's view is not controlling, it can be given "considerable weight" when the expert has met with both parents and gathered information concerning their caretaking abilities. *Id.* The district court's consideration of Dr. Brown's evaluation differs from the situation in *Rebouche* and *Pothast*. The record does not support Rene's assertions that Dr. Brown lacked neutrality in reaching his opinions regarding custody. Dr. Brown followed a protocol designed to eliminate the threat of bias, including undertaking in-depth interviews with both parents, all four daughters, and other individuals recommended by the parties' attorneys. The report was thorough and balanced. Rene's dissatisfaction with the recommendation does not prove the method of evaluation was flawed. Moreover, the district court did not cede its decision to the evaluator; it considered the report as one factor in its determination of physical care.

M. is fortunate to have her grandparents and her mother and step-father who are capable of providing her care and who wish to provide her that care. The central question presented is what is in the child's best interest. *Knell*, 537 N.W.2d at 780. ("In resolving a custody dispute, the primary consideration is the best interest of the child."). The court was faced with this difficult question and was provided relevant information from the GAL and the child's therapist, each of whom had an understanding of the situation and the parties involved.

Camille asserts several factors weigh toward a finding that the guardians have not overcome the parental preference, stressing her continued efforts to regain custody, her present suitability as a parent, her involvement with M., and the fact that M. is integrated into Camille and Travis's home. The guardians, however, place more weight on the passage of time and their close bond to M. They emphasize the opinions of the GAL and the therapist concerning the harmful effects that return may have.

This family dispute and litigation has taken its toll on all family members. The therapist, Gauger, testified the dispute has become very contentious among the family members. As we examine her testimony, it is clear her opinion is based in part upon her concerns about the family coming together to assist the child if the guardianship was terminated. She also expressed concern about the child's anxiety over the family dispute. But no matter how this case is resolved, we suspect there will be much anxiety and stress by family members, including perhaps, the child, for a period of time. We have often observed contentious intra-family custody disputes, but we expect in most instances the emotions will subside over time. However, at times the confidence the emotions will subside has not evolved as expected. *See In re Marriage of Harris*, 877 N.W.2d 434, 441 (Iowa 2016).

The Elgs have given over nine years of their lives to assure M. has a safe, healthy, and loving life. It is entirely understood that they have a strong bond to M. and M. a strong bond to them. The Elgs were there for M. when Camille was not. Without a doubt, Camille should be eternally grateful to her own parents for the sacrifices they made. But no matter the strength of the bond between M. and

her grandparents, the Elgs' custody rights were via a guardianship that could be terminated.

Here, we have a parent who is "well ahead" and "more stable" than most people Gauger has evaluated—by her words. Camille is married, her husband is a law enforcement officer, they have a child together, M. has a bonded relationship with her sibling, there is a strong mother-daughter bond, and Camille is a suitable and capable parent. Camille has been active in visitation with the child for the past few years. Unlike the therapist, we are more confident this family's emotions will subside in time and all family members will do everything they can to act in the child's best interests. Notwithstanding this litigation, the Elgs and Camille have been able to work together on visitation and communication with the therapist.

We acknowledge Camille has taken an extended time to reach her current situation. But she is not a "stranger" to M. and we do not find her to be "a parent who has taken 'an extended holiday from the responsibilities of parenthood.'" *Stewart,* 369 N.W.2d at 823 (quoting *Carrere v. Prunty*, 133 N.W.2d 692, 696 (Iowa 1965)). Camille has maintained significant contact with M. and is by all indications now a capable and stable parent. .

Because Camille is a qualified and suitable parent, and the Elgs have not presented clear and convincing evidence it would be in the child's best interests to remain outside of her mother's care, we conclude the guardianship should be terminated.

We find the supreme court's conclusion in *Hulbert* is apt here:

> Under the facts here two good homes are available to this child. Defendants have rendered outstanding service in her behalf. Their love, affection, attachment and their resistance to her leaving their home is understandable but in a matter of this kind regardless of what the decision is, someone is hurt. We express the hope it is not the child and that the parties lay aside any ill feelings which may have developed and reestablish a friendly relationship.

178 N.W.2d at 362.

The parties agree that if the child is to be returned to her mother, a transitional plan is required. We therefore reverse the district court's ruling and remand for the court to consider and implement a transitional plan for returning M. to her mother's care and custody. At the conclusion of the transition plan, the district court shall terminate the guardianship. We emphasize Gauger's cautionary testimony that an ongoing relationship between the child and her grandparents is very important!

**REVERSED AND REMANDED WITH INSTRUCTIONS.**